focuses on the factors we outlined in *Byrd v. Collins*, 209 F.3d 486 (6th Cir. 2000), for analysis of such claims.

This Circuit has explained that we will not find "manifest intent" where some other explanations for the prosecutor's comments are equally possible. *United States v. Ursery*, 109 F.3d 1129, 1135 (6th Cir.1997). In addition, we have made clear that the question is not whether the jury possibly or even probably would view the statements as comments on the defendant's failure to testify, "but whether the jury necessarily would have done so." *Id*.

*Id*. at 534.

Martin's argument is without merit. As the district court found, the entire quote shows that "some other explanations for the prosecutor's comments are equally possible." *Id*. The comment was isolated, as this is the only comment complained of by Martin. Evidence of guilt was overwhelming. Finally, the court instructed the jury to draw no inference about Martin's decision not to testify.

AFFIRMED.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0050P (6th Cir.)
File Name: 02a0050p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

ERNEST MARTIN,
  *Petitioner-Appellant,*

    *v.*

BETTY MITCHELL, Warden,
  *Respondent-Appellee.*

Nos. 00-3357/3359

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 95-02393—Donald C. Nugent, District Judge.

Argued: August 7, 2001

Decided and Filed: February 7, 2002

Before: NORRIS, SILER, and DAUGHTREY, Circuit
Judges.

————————————

**COUNSEL**

**ARGUED:** Timothy R. Payne, OHIO PUBLIC DEFENDER'S OFFICE, Columbus, Ohio, for Appellant. Norman E. Plate, OFFICE OF THE ATTORNEY GENERAL OF OHIO, Columbus, Ohio, for Appellee. **ON BRIEF:** Timothy R. Payne, Kyle E. Timken, OHIO PUBLIC DEFENDER'S OFFICE, Columbus, Ohio, for Appellant. Jon W. Oebker, OFFICE OF THE ATTORNEY GENERAL OF

OHIO, Columbus, Ohio, for Appellee.    Ernest Martin, Mansfield, Ohio, pro se.

———————————————

**OPINION**

———————————————

SILER, Circuit Judge.  Petitioner Ernest Martin, an Ohio death row inmate, appeals the district court's denial of his petition for a writ of *habeas corpus* filed pursuant to 28 U.S.C. § 2254(a).  The respondent warden will be referred to as the "State."  This court granted Martin's application for a certificate of appealablity ("COA"), allowing review of his claims of prosecutorial misconduct, ineffective assistance of counsel, and sufficiency of the evidence, subparts of those issues, and the question of procedural default as it relates to these issues.  For the reasons stated hereafter, we affirm.

**BACKGROUND**

On direct appeal, the Ohio Supreme Court summarized the relevant facts as follows:

On December 20, 1982, Ernel Foster, a security guard, was robbed of his .38 caliber Smith & Wesson revolver, Model 10, Serial No. D431784, by a black male, while waiting at a bus stop on East 93rd Street and Kinsman Avenue.  Foster testified that he chased the offender for a block and a half and was able to see his face.  He further noted that the offender's hair was in small braids.  On February 1, 1983, Foster was summoned to the police station to view a line-up composed of six black males.  Foster was able to identify the defendant-appellant, Ernest Martin, noting that his hair was braided in the same manner as it appeared on December 20, 1982.  Later, Foster identified appellant in the courtroom as the man who had taken his weapon.

Appellant's girlfriend, Josephine Pedro, testified that he had threatened her with a gun earlier that year, telling her that he had stolen the weapon from a security guard

---

violations: "Everybody available testified . . . .  Everybody could identify the defendant as the perpetrator of the crime.  Everybody testified, and there is no indications [*sic*] when the police officer testified that anyone other than the defendant committed the crime."  Martin argues that he was the only person that could have refuted the prosecutor's statement and that the lack of evidence of his guilt makes it likely that the statement contributed to his prosecution.

The government reiterates the district court's conclusion that, when read in context,[2] it is apparent that the prosecutor's statements were referring to the thorough nature of the police investigation and the presentation of the evidence generated therefrom.  The district court also found that the prosecutor "was *not* describing the evidence as uncontradicted by the defense."  (Emphasis in original).  The State's argument also

———————————————

[2] The relevant part of the prosecutor's statement is apparently not included in the joint appendix in the form of trial transcript.  The district court quoted the statement as follows:
[Prosecutor:]  The detectives investigated this case at length.  I dare say that defense counsel cannot tell you a witness who saw something or did something in this case, that the State could not present as we have here -
[Defense Counsel:] Objection, your Honor, to that statement.
Court:  Overruled.
[Prosecutor:]  Everybody available testified.  Everybody could testify the defendant as the perpetrator of the crime.  Everybody testified, and there is not indications when the police officer testified that anyone other than the defendant committed the crime.  That's why I am saying when the defense counsel argues to you, I want you to be thinking if you agree that this is reasonable; that would any counsel from my standpoint, defense counsel says, we presented evidence in this case, ask me, in my mind's eye, or them, where is the evidence that substantiates the position that you are asking us to take.

Where is the evidence that supports your argument?  And I am going to go through the evidence now, and you will find that there are facts given to you by various witnesses, some unknown to one another, and so interrelated and so pointing at Mr. Martin, that there is not doubt in this case.

### III.   Sufficiency of the Evidence

In *habeas* cases we review the sufficiency of the evidence supporting a jury verdict, through the framework of § 2254(d), to determine whether, after viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 324 (1979).

Martin argues that the evidence supporting his conviction was insufficient because: (1) Foster's identification of him at the line-up was unreliable and tainted by police comments to Foster that "we [have] the guy that robbed you"; (2) the government presented very little physical evidence; (3) witnesses Pedro and Henderson were unreliable because Pedro was not charged for her involvement and Henderson had a grudge against him; and (4) the evidence did not support a finding that he had the specific intent to kill Robinson.

As an initial matter, it must be noted that "attacks on witness credibility are simply challenges to the quality of the government's evidence and not to the sufficiency of the evidence." *United States v. Adamo*, 742 F.2d 927, 935 (6th Cir.1984). Thus, Martin's arguments with regard to Pedro and Henderson are misplaced. The district court's opinion contains an exhaustive review of the trial evidence that proved Martin's guilt. This recitation is consistent with the record and demonstrates that a rational juror could conclude that Martin committed the crimes beyond a reasonable doubt consistent with *Jackson*. Thus, Martin's argument is without merit.

### IV.   Prosecutorial Misconduct

Martin argues that "the State's comment on Mr. Martin's failure to testify violated Martin's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution." Martin complains that the following statement by prosecutor in closing argument caused these

at East 93rd and Kinsman. Pedro wrote down the serial number of the gun on the back of an envelope box. The number was identical to the serial number of Foster's weapon except that the letter "D" had been purposely transformed into a "9." Pedro testified that this was done to make the number sequence look like a telephone number in order to ward off any suspicion.

Pedro further testified that in the early hours of January 21, 1983, appellant revealed a plan to rob Robinson's Drug Store. She attempted to dissuade him but the appellant threatened her if she did not cooperate in the robbery. Appellant then left the apartment and returned approximately ten minutes later with the gun he had taken from Foster.

Appellant devised a plan whereby Pedro was to go to the store and attempt to buy medicine for a cold. When Robert Robinson, owner of the store, unlocked the door to allow Pedro's entrance, appellant planned to follow her in and rob the premises. The appellant wore gray pants, tennis shoes and a waist length black leather jacket. He covered his face with a brown knit cap in which he cut holes for his eyes to avoid identification.   At approximately 12:45 a.m., Pedro arrived at the store and knocked on the door. Upon recognizing Pedro, Robinson unlocked the door to let her in. However, he locked the door again before the appellant had a chance to gain entrance. As Robinson stood in front of the door after locking it, two shots were fired through the door fatally wounding him.   After firing the shots the appellant allegedly went to the apartment to change his clothes and then returned to the store to finish the robbery.

Monty Parkey, an employee of Robinson, was in the back room at the time of the shooting. After hearing the shots and seeing what had occurred, Parkey called an ambulance and the police. He then instructed Pedro to go to Robinson's house to get Mrs. Robinson. Pedro complied and upon returning was interviewed by the police concerning the events. She gave them her name and address and stated she knew nothing about the shooting. The appellant was also present at this time and

talked to the police. Upon completing her interview, Pedro returned to her apartment.

When Pedro reached the apartment she called her neighbor, Larry Kidd. Appellant returned approximately thirty-five minutes later. Pedro asked appellant whether the evening's events had been worth it. He showed her a pile of bills under a blanket which he then took into the bathroom and explained that he had stolen between $38 and $39 from the store.

Appellant then drove Kidd and Pedro to an "after hours" spot for drinks. After they sat down at the table, appellant took two spent cartridges from his pocket and placed them on the table. Kidd remarked: "* * * [M]ust be a night of the duces [sic], you got a duce [sic] and a quarter, and Mr. Robinson got shot twice, and you got two cartridges." Appellant did not respond to this comment.

Several days after the shooting the police again questioned Pedro and appellant. By this time the two had put together a story for the police that Pedro had gone to the store to get cough medicine when the deceased was shot and that appellant only came to the store after she had been gone for an unusually long time. On January 29, 1983, the police returned and arrested Pedro and appellant for the murder of Robinson. After several days in jail, Pedro told the police that she had helped set up the robbery by going to the store and that the appellant had shot the deceased. Soon afterwards, appellant's father contacted Pedro asking her to change her statement. While visiting appellant in jail, appellant's father again asked Pedro to change her story. During the trial, the state introduced a letter dated February 13, 1983, wherein appellant asked Pedro to "tell the truth" and implicate a man named "Slim" for the murder-robbery of Robinson. An additional letter dated February 17, 1983, in which appellant again asked her to implicate "Slim," was also introduced into evidence. Pedro has continually denied that "Slim" had anything to do with these crimes.

assistance of counsel. The State points out that once such a report is requested, Ohio Rev. Code § 2929.03(D)(1), requires that it be furnished to the court, the trial jury, if applicable, the prosecutor, and the offender or his counsel. This requirement also applies to the psychiatric report. Thus, a request for the reports involves the type of strategic decision that *Strickland*, 466 U.S. at 690, holds should not be second-guessed. Martin's counsel did not know that this specific statement would be in the presentence report, and their strategic decision to request it should not be second-guessed. The same reasoning is applicable to the conclusions of the psychological report. Because raising the effectiveness of his trial counsel with regard to these reports on direct appeal would have been fruitless, we cannot fault Martin's appellate counsel for not doing so.

C. Appellate Counsel

Martin argues that his appellate counsel rendered ineffective assistance by failing to make the transcript of the proceedings on his motion for a new trial part of the record on his direct appeal. Viewing this claim in the framework outlined in *Mapes*, quoted above, it lacks merit because its underlying premises, that counsel ineffectively failed to procure Rieves-Bey's testimony and that the testimony would have changed the outcome of the trial, is incorrect.

As discussed previously, both parties attempted to locate Rieves-Bey in time to testify at trial. He gave inconsistent statements and testimony about the physical description of the man he saw flee from the crime scene, stated that Martin was not the fleeing man, and that the police had the wrong man; however, his other testimony corroborated Pedro's version and sequence of the events, which was highly incriminating. At best, he was a problematic witness because of his admitted drug use and the effect he admits it had on his memory. Martin cannot show prejudice as Rieves-Bey's testimony was incriminating and would not have aided his defense. Accordingly, this claim is without merit.

U.S. at 407, 109 S.Ct. 1211; *Kordenbrock*, 919 F.2d at 1101.  As *Mapes* points out, this instruction accurately describes Ohio law.  There is no error with regard to this instruction.

*Id*.  This holding also reflects the state of Ohio law at the time of Martin's sentencing, and, thus, this argument is without merit.

#### 3. Presentence investigation and psychiatric clinic report

In Martin's final subclaim involving allegations of ineffective assistance of trial counsel at sentencing, he contends that his counsel ineffectively agreed to the production of a presentence report and psychological evaluation.  The presentence investigation report contained the following statement concerning the impact of the crime on the victim's wife: "Mrs. Robinson was very abrupt in her comments and very dramatic, indicating 'He shot my husband in the back, he is a skunk, and he needs to get the electric chair.'"  Martin argues that this statement is unconstitutional under *Payne v. Tenn.*, 501 U.S. 808, 827 (1991), which overruled *Booth v. Maryland*, 482 U.S. 496 (1987), but left intact its prohibition against such statements.  Although Mrs. Robinson's statement was somewhat inflammatory, the presentation of the reports also allowed Martin to present his defense of the charges without being subjected to cross examination.  Both reports relate that Martin denied the robbery and the homicide.  The presentence investigation also elaborated on more specific parts of his defense, such as the appearance of "Slim" with Pedro near the time of the crime.

We are careful to point out that Martin has argued this issue in terms of whether his trial counsel rendered ineffective assistance by requesting these reports and whether appellate counsel rendered ineffective assistance by not making an issue of the requests for the reports on appeal.  In this context, even if we assumed that the inclusion of Mrs. Robinson's statement ran afoul of *Payne* and *Booth*, this claim is without merit in the form in which it is presented - ineffective

The state also offered another letter into evidence which had been written by the appellant to Pedro when he was in jail in February 1981 for another offense.  Pedro identified the letter and read it into the record.  The letter asked Pedro to lie for appellant and to implicate someone else for the commission of the offense for which the appellant was charged.  Pedro admitted lying for the appellant pursuant to the letter in the previous trial for the other offense.

Finally, Antoinette Henderson testified that she lived with Pedro for about five or six months until the middle of December 1982.  During December she heard the appellant say he was going to rob Robinson's store.  Appellant threatened her with a gun, warning her that she had better not tell anyone of his plan.

During the trial the defense presented no witnesses, but sought to introduce into evidence written statements of Pedro and Henderson.  The court denied this request finding the written statements were not inconsistent as alleged by the defense.

The jury found the appellant guilty of the aggravated robbery of Ernel Foster and of the aggravated robbery and aggravated murder of Robert Robinson with the specification of being the principal offender of the aggravated murder while committing or attempting to commit aggravated robbery.  After the mitigation hearing was conducted, the jury recommended that appellant receive the death penalty.  On July 8, 1983, the trial court sentenced appellant to death.  On July 13, 1983, appellant filed a motion for a new trial.  On May 9, 1984, the motion was denied.  On May 23, 1984, the court filed its required judgment entry and separate opinion, pursuant to R.C. 2929.03(F), finding that the aggravating circumstances outweighed the mitigating factors.  The following day, the trial court filed its opinion on the motion for a new trial.

On August 5, 1983, appellant appealed his conviction to the court of appeals. The court of appeals affirmed the sentence of the trial court and issued a separate opinion as required by R.C. 2929.05(A) on September 27, 1984.

*State v. Martin*, 483 N.E. 2d 1157, 1159-61 (Ohio 1985).

E.J. Rieves-Bey lived across the street from the victim's store and witnessed someone running away from the scene after hearing shots fired. Within two weeks of the killing, he gave a statement to the Cleveland police describing the man he saw fleeing as 5'10" and 170 lbs, roughly matching Martin. Approximately a month later, he told a court-appointed investigator that the man was "About six foot, two maybe three . . . Maybe about 180, 200 pounds." He also stated, "I know he's taller than Ernest Martin, and Ernest Martin is smaller, way smaller."

The State subpoenaed Rieves-Bey to testify, but he arrived just as jury deliberations began. The State sought to reopen its case and present the testimony of Rieves-Bey. The defense successfully objected, and deliberations continued.

At the hearing on Martin's motion for a new trial, Rieves-Bey described the man he saw fleeing from the scene as "about six foot, 200 pounds." He also stated that the man was wearing "a black coat, and a brown mask and sort of a hat." He testified that several minutes after he saw the fleeing man, he saw Martin walking toward the crime scene, and that he was wearing "[a] brown long coat, lighter, a brown coat." This description corroborated Pedro's testimony that Martin wore a black leather jacket and brown mask with holes cut for eyes, prior to and during the crime, and that when he returned to the store after the shooting, he wore a "long grey coat."

Rieves-Bey gave a 1997 deposition for purposes of Martin's *habeas* action. He was incarcerated at the time. He insisted that Martin "wasn't the man" that he saw fleeing the scene. During the deposition, he admitted that his cocaine addiction had impaired his memory, and that he couldn't remember giving testimony in 1983 about the case.

The United States Supreme Court denied Martin's petition for a writ of certiorari, *see Martin v. Ohio*, 474 U.S. 1073 (1986), and later, his petition for rehearing. *See Martin v. Ohio*, 475 U.S. 1040 (1986). Thereafter, Martin

2. Failure to object to jury instructions

This claim does not involve evidence *dehors* the record, was not raised on Martin's direct appeal, and thus is procedurally defaulted. However, we will review the merits of these issues for purposes of cause and prejudice analysis.

Martin argues that his counsel rendered ineffective assistance by failing to object to jury instructions, which he contends were constitutionally infirm pursuant to *Caldwell v. Mississippi*, 472 U.S. 320 (1985), because they allegedly improperly led the jury to believe that the ultimate responsibility for the imposition of death lay elsewhere by stating that the jury only recommended the death penalty to the judge. Our court recently rejected this argument in *Scott v. Mitchell*, 209 F.3d 854, 877 (6th Cir. 2000), as follows:

We further conclude, however, that the district court correctly determined that neither of these claims had merit. The trial judge instructed the jury that its recommendation of death would be "just that--a recommendation," while a recommendation of life imprisonment "is binding upon the Court, and I, the Judge, must impose the specific life sentence which you recommend." Scott claims that this violates the principle established in *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), that courts must not mislead the jury into believing it has less responsibility than it actually does for choosing the death sentence.

We recently rejected this precise claim in *Mapes v. Coyle*, 171 F.3d 408, 414-15 (6th Cir.1999). Moreover, as the district court correctly held, *Caldwell* is limited to situations in which the jury is misled as to its role "in a way that allows [it] to feel less responsible than it should for the sentencing decision. Thus, to establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Romano v. Oklahoma*, 512 U.S. 1, 9, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994) (citations and alterations omitted); *see also Dugger*, 489

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

As stated above, these ineffective assistance of counsel claims were not raised during Martin's direct appeal. The Ohio courts declined to review these claims for this failure. *See Perry*, 226 N.E.2d at 105-06; *Cole*, 443 N.E.2d at 170. Martin has "failed to develop the factual basis of [these] claim[s] in State court proceedings," § 2254(e)(2), and, thus, a hearing is only warranted if he has shown that his claims fit the exceptions in § 2254(e)(2)(A) or (B).

Section 2254's Subsection (e)(2)(A)(i) is not applicable to this claim. Therefore, a hearing would be warranted only if Martin has provided the requisite showing that: " [this] claim relies on . . . (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."

Martin has not attempted to show that the factual predicate to his claim of ineffective assistance of counsel at the mitigation phase could "not have been previously discovered through the exercise of due diligence." His brief attempted no such showing, and, at oral argument, his counsel could not explain why nearly 20 years had passed without an attempt to depose, interview, or otherwise contact Martin's trial counsel. Likewise, Martin's failure to point to mitigating evidence that presumably should have been, but was not presented, at sentencing, i.e., his failure to show prejudice, makes it clear that he has not met the requirement of § 2254(e)(2)(B). Thus, Martin is not entitled to an evidentiary hearing with regard to this claim.

unsuccessfully exhausted his remaining post-conviction state court remedies and appeals.

In 1995, Martin filed a motion for stay of execution and appointment of qualified federal counsel in the district court. In 1996, Martin filed his petition for a writ of habeas corpus in the district court. The district court denied his petition and a certificate of appealability on November 2, 1999. In February 2000, it denied his motion for amended judgment. In November 2000, we granted Martin's application for a certificate of appealablity to review his claims of prosecutorial misconduct, ineffective assistance of counsel and sufficiency of the evidence.

In sum, Martin makes the following claims: (A) ineffective assistance of trial counsel, Herbert Adrine and James Carnes, for their failure to (1) challenge Martin's warrantless arrest; (2) investigate and otherwise prepare for trial; (3) interview witnesses; (4) subpoena Rieves-Bey; (5) effectively cross-examine witnesses; (6) investigate and otherwise prepare for the mitigation phase; (7) object to jury instructions; (8) object to the use of presentence investigation and psychiatric clinic reports at mitigation; (B) ineffective assistance of appellate counsel for failing to make the transcript of his hearing on his motion for a new trial part of the record on his direct appeal; (C) prosecutorial misconduct at trial by improperly commenting on his failure to testify; and (D) insufficiency of the evidence supporting his conviction.

### STANDARD OF REVIEW

Because Martin filed his *habeas* petition on June 20, 1996, our review is governed by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997).

A federal court is authorized to grant a writ of habeas corpus to a person in custody pursuant to a state-court judgment, but only if the adjudication of the claim

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The Supreme Court has declared that "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Williams v. Taylor*, 529 U.S. 362, 409 (2000). In its elaboration on the meaning of the term "objectively unreasonable," the Court stated that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411. Finally, a district court's denial of the writ is subject to *de novo* review. *See Rogers v. Howes*, 144 F.3d 990, 992 (6th Cir.1998).

*Wilson v. Mitchell*, 250 F.3d 388, 393-94 (6th Cir. 2001). We review the district court's findings of fact on a disposition of a petition for a writ of *habeas corpus* for clear error. *See Cone v. Bell*, 243 F.3d 961, 967 (6th Cir. 2001).

*Habeas corpus* relief is available only if the applicant first exhausts remedies available in state court. *See* 28 U.S.C. § 2254(b)(1)(A). "If the state court adjudicates and rejects a claim on adequate and independent state grounds, such as a state procedural rule that precludes adjudicating the claim on the merits, the petitioner is barred by this procedural default from seeking federal habeas review of such claim, unless the petitioner can show 'cause and prejudice' for the default." *See Cone*, 243 F.3d at 967 (citing *Coleman v. Thompson*, 501 U.S. 722, 750-51 (1991); *Wainwright v. Sykes*, 433 U.S. 72, 87-88 (1977)).

"psychological workup" is also included in the quantum of counsel's preparation for and performance at the mitigation phase.

The affidavits of Martin's family members state their willingness to testify at his sentencing but do not show what mitigating evidence would have been presented had they testified. Although Martin has made an attempt to show prejudice with regard to mitigating evidence about his background and psychological makeup, evidence of his background *was* presented and he has not pointed to mitigating psychological evidence that should have been presented. Thus, he has not shown prejudice and his claims are without merit.

Martin's briefs did not take issue with the lack of an evidentiary hearing in the district court with regard to these specific claims. In his Rule 59(e) motion for an amended judgment, he complained generally about the district court's application of AEDPA to his petition and stated that the application of the standards for deciding the necessity of an evidentiary hearing in § 2254(e)(2) "present[ed] the potential for retroactive effects." At oral argument, Martin's counsel, in a limited way, argued that he should be entitled to an evidentiary hearing with regard to his claims of ineffective assistance of counsel at the mitigation phase.

The applicable version of § 2254(e)(2) provides:

(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--
  (A) the claim relies on--
  (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
  (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

provides considerable evidence toward a finding of a psychological disorder that fulfills the characteristics of statutory mitigating factors under R.C. 2929.04(B)(3) and (7). This diagnosis was not developed in the cursory and incomplete psychological workup completed by the Cleveland Court Clinic.

As is evident from the summaries above, the testimony of Martin's mother and grandmother did discuss most, if not all, of the factors in the affidavit. Granted, defense counsel did not produce expert testimony to draw conclusions from the facts presented by these two witnesses, but their testimonies did recount facts and occurrences showing everything that Dr. Schmidtgoessling contends was not, but should have been, presented. Some of this information is also found in the presentence investigation and the psychological report given to the jury. Dr. Schmidtgoessling's affidavit also fails to specify the "severe psychological disorder" from which Martin allegedly suffers. Thus, this "diagnosis" is no more than a conclusory statement from a psychologist who has never examined Martin. This part of the affidavit makes reference to the fact that the "Cleveland Court Clinic" completed a psychological workup of Martin for purposes of mitigation. The report generated from this workup was attached to Martin's motion to supplement the record. Thus, a psychological examination of Martin was conducted and a report of the examination was provided to the judge and jury during the mitigation phase. Martin argues that the report's conclusions were self-serving to the State and lacked credibility merely because it was generated by a State-employed pschyoanalyst. We have never found counsel to be ineffective solely because the expert used was on the State payroll. After all, the expert, Dr. Schmidtgoessling, now being touted by Martin, is apparently a government employee. Martin also argues that his counsel was ineffective for agreeing to have the report prepared, as discussed *infra*, but in truth, his argument rests on the fact that he did not like the conclusions it conveyed. As discussed below, once the report was requested, Ohio law required that the sentencing judge, the jury, and both parties obtain copies for review. Thus, this

However, there are several prerequisites before the cause and prejudice test is applied in a federal court to any kind of state procedural default. "First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule." *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir.1986). "Second, the court must decide whether the state courts actually enforced the state procedural sanction." *Id*. Third, the procedural default must be an "independent and adequate" state ground on which the state can rely to foreclose review of a federal constitutional claim. *County Court of Ulster County, New York v. Allen*, 442 U.S. 140, 148 (1979). If these three prerequisites are met, a federal court must determine whether the petitioner is able to meet the cause and prejudice test to excuse the state procedural default.

The cause and prejudice standard is a two-part test in which the petitioner must: (1) present a substantial reason to excuse the default, *Coleman*, 501 U.S. at 754; and (2) show that he was actually prejudiced as a result of the claimed constitutional error, *United States v. Frady*, 456 U.S. 152, 167-69 (1982).

If the claims presented in the federal court were never actually presented in the state courts, but a state procedural rule now prohibits the state court from considering them, the claims are considered exhausted, but are procedurally barred. *Coleman*, 501 U.S. at 752-53.

*Id*. In *Coleman v. Mitchell*, 244 F.3d 533 (6th Cir. 2001), we explained the last resort for *habeas* petitioners who fail to show cause and prejudice for procedural default:

When a habeas petitioner has failed to show cause for not asserting his ineffective assistance of appellate counsel claim properly in the Ohio courts, a federal court may not reach the merits of the habeas claim unless the petitioner can show that refusal to consider his claim would result in a fundamental miscarriage of justice. The fundamental miscarriage of justice exception requires a

showing that "in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 329 (1995).

*Id.* at 540.

As relevant here, we have recognized that Ohio applies *res judicata* to bar the consideration of constitutional issues that were not, but could have been, raised on direct appeal.

In 1967, the Ohio Supreme Court held that "[c]onstitutional issues cannot be considered in post-conviction proceedings under Section 2953.21 *et seq.*, Revised Code, where they have already been or could have been fully litigated by the prisoner while represented by counsel, either before his judgment of conviction or on direct appeal from that judgment, and thus have been adjudicated against him." *State v. Perry*, 226 N.E.2d 104, 105-06 (Ohio 1967) (syllabus para. 7). In *State v. Cole*, 443 N.E.2d 169 (Ohio 1982), the state supreme court articulated how this procedural rule would apply with respect to ineffective assistance of trial counsel claims. The court explained: "Where defendant, represented *by new counsel upon direct appeal*, fails to raise therein the issue of competent trial counsel and said issue could fairly have been determined *without resort to evidence dehors [i.e., outside] the record*, *res judicata* is a proper basis for dismissing defendant's petition for post-conviction relief." *Id.* at 170 (syllabus).

*Byrd v. Collins*, 209 F.3d 486, 520 (6th Cir. 2000) (emphasis added).

and family members, and his counsel requested a presentence report, which detailed his background, and a psychiatric report, which recounted his history of psychological evaluations and included a "mental status examination." Counsel elicited the testimony of Martin's mother and grandmother, in which they provided details of his troubled youth. While certainly not exhaustive, this action constitutes an investigation. Thus, Martin cannot show that he suffered constructive denial of counsel, so he must show how his counsel's deficiencies prejudiced the outcome of his sentencing proceeding. *See Strickland*, 466 U.S. at 694.

Martin's initial brief completely fails to point to what mitigating evidence further action on the part of his counsel would have uncovered. The affidavits of those he claims should have been witnesses at the hearing do not state what they would have offered on his behalf. Martin's reply brief references the affidavit of Dr. Nancy Schmidtgoessling, which states "the transcript material suggests that the defense could not have put on a well thought out, well developed mitigation, as they lacked the data to do so." The affidavit also states:

Among the significant factors that defense counsel failed to present to the jury in mitigation of the sentence are the following extremely significant psychological data:
A)  family history of alcoholism;
B) family history of physical abuse;
C) parental dysfunctional and chaos that had a significant impact on Ernest Martin's adult psychological functioning;
D) the impact of Martin's less than average intellectual functioning (as noted in school records) in his adaptation;
E) the history of inappropriate behavior and troubled emotional status that was recognized and even attempted to be treated during Martin's childhood years.

\* \* \*

Perhaps most significantly, however, the trial defense failed in any way to develop the fact that Ernest Martin suffers a severe psychological disorder that substantially impairs his functioning in society. This diagnosis

in which defense counsel *have totally failed to conduct such an investigation*. In contrast, if a *habeas* claim 'does not involve a failure to investigate but, rather, petitioner's dissatisfaction with the degree of his attorney's investigation,' the presumption of reasonableness imposed by *Strickland* will be hard to overcome.

*Id*. at *19 (citing *Lewis v. Alexander*, 11 F.3d 1349, 1353 (6th Cir.1993)) (emphasis added). The court then rejected the petitioner's claims of ineffective assistance of counsel at sentencing, which were based upon the alleged failure of his counsel to discover that he suffered from post-traumatic stress disorder ("PTSD"), because the petitioner had not pointed to anything in the record that showed he suffered from PTSD or any other psychological disorder. *Id*. at 22. The court stated:

> We also note that, unlike in *Seidel* [*v. Merkle*, 146 F.3d 750, 752 (9th Cir. 1998)] and *Glenn* [cited *supra*], Campbell has not pointed to anything in his childhood medical records indicating that he has either PTSD or some form of brain damage. He has never been diagnosed or treated for PTSD, whereas the medical records in Seidel explicitly noted the defendant's mental afflictions. *See Seidel*, 146 F.3d at 755-56. At most, Campbell's childhood medical records would have provided another list of people to interview. These former physicians and healthcare workers, Campbell argues, would have been able to expose his mental condition.
>
> This is much too tenuous a claim to support the conclusion that Campbell was prejudiced by his attorneys' failure to look into his childhood medical records.

*Id*.

Here, there was "something[,]" *Coleman*, 244 F.3d at 544, of a mitigating nature presented at the hearing by defense counsel. There was limited contact between defense counsel

## DISCUSSION

### I. Procedural Default

#### A. Sufficiency of the Evidence

Martin's sufficiency of the evidence claim was raised in his direct appeal and thus preserved for federal *habeas* review.

#### B. Ineffective Assistance of Appellate Counsel

The district court found that Martin had not procedurally defaulted his claim of ineffective assistance of appellate counsel. This claim took issue with counsel's failure to make the transcript of the hearing on Martin's motion for a new trial part of the record for his direct appeal. This argument, and other ineffective assistance of appellate counsel claims, as discussed *infra*, were raised in Martin's post-conviction application for delayed reconsideration, as authorized by *State v. Murnahan*, 584 N.E. 2d 1204, 1209 (Ohio 1992). The application was denied by the Ohio Court of Appeals in a one-sentence opinion that did not state whether the decision was on the merits or based upon procedural grounds. The district court, while recognizing this court's holding in *Simpson v. Sparkman*, 94 F.3d 199, 203 (6th Cir. 1996) (when a state court of appeals decision is silent as to the grounds for denying a claim, it is assumed that the court observed its own procedural bar), nonetheless ruled that it was improper to assume that the claim was rejected upon a procedural ground, because *Murnahan* had just been decided, and the brief Court of Appeals opinion did not state the basis of its denial as required by *Murnahan*. The State does not challenge this finding or otherwise argue that this claim was not preserved for federal *habeas* review.

#### C. Ineffective Assistance of Trial Counsel / Prosecutorial Misconduct

Martin raised his claims of ineffective assistance of trial counsel in post-conviction proceedings rather than by direct appeal. Thus, these claims were barred by *res judicata*

pursuant to *Perry*.  *See Byrd*, 209 F.3d at 520.  Nonetheless, he argues that these claims are not procedurally defaulted because the last state court rendering judgment on the case did not clearly and expressly state that its judgment rested on a procedural bar *See Harris v. Reed*, 489 U.S. 255, 262 (1989).  This contention is not accurate.  When addressing these claims, the court held:

> We find that these were all matters that could have been addressed on defendant's direct appeal since defendant was represented by new appellate counsel and are therefore barred by the doctrine of res judicata as found by the trial court.

*State v. Martin*, 1995 WL 66698, *3 (Ohio App. 1995).  Martin simply ignores this opinion and focuses on a lower court opinion that was not the last state court rendering judgment on the case.  Thus, this argument is without merit.

Martin also argues that the ineffective assistance of his appellate counsel is cause and prejudice for not raising his claims of ineffective assistance of trial counsel on direct appeal.  In Martin's post-conviction application for delayed reconsideration, he raised claims of ineffective assistance of appellate counsel, based upon the failure of his appellate counsel to raise the ineffectiveness of trial counsel for not challenging his warrantless arrest, objecting to jury instructions, obtaining the attendance of Rieves-Bey, and performing effectively at the mitigation phase.  If Martin can show that he received ineffective assistance of appellate counsel that rose to the level of a violation of his Sixth Amendment rights, it would excuse his procedural default. *See Seymour v. Walker*, 224 F.3d 542, 550 (6th Cir. 2000) (citing *Murray v. Carrier*, 477 U.S. 478, 488 (1986)).  In *Mapes v. Coyle*, 171 F.3d 408 (6th Cir. 1999), we provided guidance on considerations relevant to claims of ineffective assistance of appellate counsel.

The cases decided by this court on the issue of ineffective assistance of appellate counsel suggest the following considerations that ought to be taken into account in

obtains and presents something in mitigation, minimal standards require some investigation." *Id*.  Recently, in *Carter v. Bell*, 218 F.3d 581, 600 (6th Cir.2000), and *Skaggs v. Parker*, 235 F.3d 261, 269, 271 (6th Cir.2000), this court has held that failure to investigate possible mitigating factors and failure to present mitigating evidence at sentencing *can* constitute ineffective assistance of counsel under the Sixth Amendment.

* * *

While recent decisions from this court have emphasized that failure to present mitigating evidence at sentencing may constitute ineffective assistance of counsel under the Sixth Amendment, counsel may nevertheless make a reasonable decision that investigation is not necessary. *See Strickland*, 466 U.S. at 691.  Indeed, the *Strickland* Court noted that "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.  Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant." *Id*.

*Id*. (emphasis in original). We then rejected Coleman's claim that the failure of his counsel to investigate mitigating evidence amounted to ineffective assistance because Coleman had been uncooperative and had directed his counsel to present limited evidence at the hearing, instructing him "not to investigate mitigating factors." *Id*. at 545-46.

*Campbell v. Coyle*, ___ F.3d ____ , 2001 WL 863560 (6th Cir. 2001), another case involving a *habeas* petition filed by an Ohio death row inmate, further illuminates the standards applicable to ineffective assistance of counsel arguments related to capital sentencing proceedings.  The *Campbell* court stated:

> [W]e note that the cases where this court has granted the writ for failure of counsel to investigate potential mitigating evidence have been limited to those situations

Among other things, trial counsel failed to present the defendant's military record, religious and volunteer activities, or experts who could testify about sociological or psychological factors. *See id.* Under these circumstances, the Court found the representation was objectively unreasonable. *See id.* at 1170-71.

In *Austin v. Bell*, 126 F.3d 843, 848 (6th Cir.1997), this Court held that the failure of trial counsel "to investigate and present any mitigating evidence during the sentencing phase so undermined the adversarial process that [defendant's] death sentence was not reliable." Relying on this Court's holding in *Glenn v. Tate*, 71 F.3d 1204, 1206-08 (6th Cir.1995), that counsel provided ineffective assistance where information was not presented to the jury at sentencing because counsel made little attempt to prepare for the sentencing phase, the *Austin* court found that "given that several of [defendant's] relatives, friends, death penalty experts, and a minister were available and willing to testify on his behalf," failure to present any mitigating evidence "does not reflect a strategic decision, but rather an abdication of advocacy." *Austin*, 126 F.3d at 849.

*Id.* at 595. In *Coleman v. Mitchell*, 244 F.3d 533, 544-45 (6th Cir. 2001), we clarified the import of some of these recent cases as follows:

> We recognized in *Mapes v. Coyle*, 171 F.3d 408 (6th Cir.), *cert. denied*, 528 U.S. 946 (1999):
> Under the Ohio statute, a capital defendant found guilty of a death specification has to present *some* mitigating evidence in order to avoid the death penalty. If a jury has nothing to weigh against the aggravating circumstance, it almost certainly must find that the aggravating circumstance outweighs the (nonexistent) mitigating circumstances, and recommend death.
> *Id.* at 426.
> And, the *Mapes* court also stated that "when a client faces the prospect of being put to death unless counsel

determining whether an attorney on direct appeal performed reasonably competently.

(1) Were the omitted issues "significant and obvious"?
(2) Was there arguably contrary authority on the omitted issues?
(3) Were the omitted issues clearly stronger than those presented?
(4) Were the omitted issues objected to at trial?
(5) Were the trial court's rulings subject to deference on appeal?
(6) Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?
(7) What was appellate counsel's level of experience and expertise?
(8) Did the petitioner and appellate counsel meet and go over possible issues?
(9) Is there evidence that counsel reviewed all the facts?
(10) Were the omitted issues dealt with in other assignments of error?
(11) Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

*Id.* at 427-28.

The government responds by arguing that Martin waived this issue by not arguing cause and prejudice before the district court. Martin submitted proposed findings of fact and conclusions of law to the district court which included the general statement, "In this case, the ineffective representation received by Ernest Martin both at trial and in his direct appeals resulted in any procedural default found to exist and was so egregious as to produce a miscarriage of justice and to justify the exercise of this Court's equitable discretion to grant habeas review of any and all claims found to be otherwise defaulted." However, his claims of ineffective assistance of appellate counsel on his *habeas* petition were limited to the failure of appellate counsel to have the

transcript of the hearing on his new trial motion made part of the record on appeal.

Excusing procedural default for "cause and prejudice" and a grant of relief for ineffective assistance of counsel involves an examination of whether prejudice occurred, *see Frady*, 456 U.S. at 167-69; *Strickland v. Washington*, 466 U.S. 688, 694 (1984). Thus, if Martin's underlying ineffective assistance of trial counsel arguments lack merit, he cannot show "cause and prejudice" via ineffective assistance of appellate counsel. Of course, our procedural default analysis is ultimately complicated by the fact that, although Martin apparently preserved ineffective assistance of appellate counsel arguments for federal review through his *Murnahan* application, he only presented one such argument with specificity on his *habeas* petition and that argument did not include his claim that appellate counsel should have raised ineffective assistance of trial counsel with regard to the merits he attempts to present in this action.

Just prior to the *Mapes* court's recital of the considerations relevant to the constitutional effectiveness of appellate counsel, it noted that Mapes's claim of ineffective assistance of trial counsel at the mitigation stage was procedurally defaulted, but could be addressed in considering whether appellate counsel was ineffective in failing to raise it on direct appeal. *Mapes*, 171 F.3d at 427. Like Martin, Mapes raised ineffective assistance of appellate counsel, with regard to mitigation, in a post-conviction proceeding, *id*. at 412; however, unlike here, Mapes's *habeas* petition also sought relief on this specific ground.

Another concern in this regard is the fact that our COA did not grant review of the ineffective assistance of appellate counsel claims that charged ineffective assistance of trial counsel. Of course, we would have no reason to do so since these specific issues were not raised in the *habeas* petition or considered by the district court. The COA did provide that the parties could address the question of procedural default related to the merit issues upon which the COA was granted.

In support of these propositions, he cites several recent cases from this circuit in which *habeas* relief has been granted for the failure of counsel to investigate at mitigation. This court's opinion in *Carter v. Bell*, 218 F.3d 581 (6th Cir. 2000), reviewed these cases and *Williams v. Taylor*, 529 U.S. 362 (2000), as follows:

In *Williams*, the Supreme Court found that trial counsel's representation of the petitioner during the sentencing phase fell short of professional standards . . . .

* * *

In *Mapes v. Coyle*, 171 F.3d 408, 426 (6th Cir.1999), this Court noted that "when a client faces the prospect of being put to death unless counsel obtains and presents something in mitigation, minimal standards require some investigation." Moreover, in *Rickman* [*v. Bell*, 131 F.3d 1150 (6th Cir. 1997)], this Court found deficiencies so severe as to dispense with the need for a showing of prejudice under *Strickland*. 131 F.3d at 1157. The Court noted that trial counsel "did not interview any witnesses, conduct any legal research, or obtain and review any records, including those regarding [petitioner's] employment, education, mental health, social services contacts, military service, or prison experience." *Id*. Further, trial counsel's trial preparation "consisted solely of interviews he conducted with [the petitioner]." *Id*. Although we note that, unlike *Rickman*, there was no hostility on the part of trial counsel in this case, we find that *Rickman* stands for the relevant proposition that the complete failure to investigate, let alone present, existing mitigating evidence is below an objective standard of reasonable representation, and may in fact be so severe as to permit us to infer prejudice.

In *Groseclose v. Bell*, this Court considered a Tennessee case in which trial counsel "almost entirely failed to investigate the case; he never, for example, interviewed the crime-incident witnesses or any family members." 130 F.3d 1161, 1166 (6th Cir.1997). In *Groseclose*, trial counsel failed to present mitigating evidence during the sentencing stage of the proceedings.

statement in which he attempted to convey a metaphor which analogized Martin to a knotty "cord of wood" that society had unjustly cast aside at an early age.  He concluded by stating:

> If Ernest Martin is guilty of this, I say, let's improve. If he is going to a [*sic*] institution, let's see if we can't do something to change the outlook or the view or maybe his like that cord of wood, and all he is worth is casting aside, or putting it in a wood burning stove.
>
> I don't know, but this will be your choise [typo].  My Bible always says, judge, and says judge thee not – we have to be careful as to whether you want the same judgment.
>
> Thank you again.

Martin argues that the course of these proceedings shows his counsel's complete failure to investigate mitigating evidence and that this insufficiency was so severe that we should infer prejudice pursuant to *United States v. Cronic*, 466 U.S. 648, 658 (1984).

In regard to the cooperation of Martin, Carnes stated, "We found him to be [a] very difficult, uncooperative client." Co-counsel Adrine, added, "And even hostile at times."  *Id*. Martin argues that this statement shows that "Defense counsel was [*sic*] sabotaging their own client's case."  Martin's lack of cooperation is evident from an exchange between his counsel and the judge in which counsel stated that Martin wanted to give an oral statement, not under oath, at sentencing, but that he was unwilling to tell counsel what the statement would relate, even though they had advised him that he should do so.

He also argues that defense counsel impeached his credibility by telling the judge, just after the exchange described  immediately above, that he had admitted lying to them about a letter "relating to a different matter."  They argue that these two statements further provide evidence of "counsel's abandonment of Mr. Martin."

Inasmuch as the merits of the ineffective assistance of appellate counsel arguments are hopelessly intertwined with the procedural default arguments regarding the merit claims upon which we granted review, our grant of review on procedural default encompasses these claims.

At oral argument, the State conceded that Martin's ineffective assistance of counsel arguments that relate to the performance of his counsel at the mitigation stage required an examination of evidence *dehors* the record and that these claims therefore were not procedurally defaulted.

Martin makes essentially the same procedural default argument with regard to his claim of prosecutorial misconduct.  In claim O(c) of his post-conviction application for delayed reconsideration, he argued that he received ineffective assistance of appellate counsel because his counsel had not argued that the prosecutor had improperly commented on his failure to testify.  He argues that appellate counsel's ineffectiveness in this regard is cause and prejudice and thus excuses his failure to raise the issue on direct appeal.  He did not raise this argument before the district court.

Martin's failure to raise ineffective assistance of counsel and prosecutorial misconduct on direct appeal resulted in procedural default.  He raised the merits of these claims in his ineffective assistance of appellate counsel on his *Murnahan* application, but he did not petition the district court for *habeas* relief in this regard.  Thus, our discussion of the merits of these claims, save the effectiveness of his counsel at mitigation, is limited to his cause and prejudice arguments.

## II.  Ineffective Assistance of Counsel

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id*. at 687. Both prongs of the inquiry are mixed questions of law and fact reviewed *de novo*. *See id*. at 698.

A.   Ineffective Assistance of Trial Counsel

  1.   Failure to challenge Martin's warrantless arrest.

Martin argues that his counsel should have moved to suppress evidence that he contends was the fruit of his January 29, 1983 warrantless arrest at the apartment he shared with Pedro. The district court held that this challenge failed because the police had probable cause to arrest Martin. Martin points out that, absent exigent circumstances, police officers are required to secure an arrest warrant prior to arresting a suspect in his home. *See Payton v. New York*, 445 U.S. 573, 587-90 (1980). The State responds by arguing that *New York v. Harris*, 495 U.S. 14, 17-18 (1990), demonstrates that Martin's warrantless arrest would not have entitled him to have the subsequent identification by Foster and Pedro's statement to police suppressed.

Martin does not argue that the police lacked probable cause to arrest him. Thus, although Martin's arrest could have been illegal, his identification by Foster and Pedro's statement to police were not suppressible fruits of this tainted action. *See id*. As any motion to suppress this evidence would have failed, Martin cannot show how the failure to make the motion was a result of his counsel's deficient performance or that the failure resulted in prejudice to his defense. Accordingly, Martin cannot show that his appellate counsel rendered ineffective assistance by failing to raise this issue on

After Mrs. Martin's testimony, the defense stated that it had nothing further to offer. The judge then began calling into the audience, inquiring as to whether other family members were present and wished to testify. This constitutes the other action by the judge that Martin contends demonstrates his counsel's ineffectiveness at the hearing. When the judge asked Martin's father, "Don't you want to come up here and speak for your son?", he replied, "You mean come now?" Defense counsel then stated that Martin's father did not want to testify, and the judge asked, "You feel that would not be helpful to the defendant?", to which counsel responded, "It might not be in the best interest." The judge then inquired whether Martin's counsel wanted to talk to a lady in the courtroom. Counsel responded, "I would like the record to show, Judge, that this is not the first time we have talked to Mr. Wilkins about testifying . . . . Mr. Adrine [co-counsel] has been in constant communication with him. Up to this point, they were fine, but now, there seems to be some interest - -" Adrine then interrupted, indicating that Martin's grandmother would testify. The judge then stated, "Okay. Bring in the jury." Earlier in the proceeding, Adrine stated, "Yes, we might further state for the record, that we have been in constant contact with the family outside, inside, during the course of the hearing, and we have discussed the matters fully with both mother and father, the brother, sister, and by telephone we have had several conversations."

Martin's grandmother, Hattie Mae Johnson, then testified about the following facts: she took care of Martin when he was a baby and when he was five and six years old; he wanted to go to church with her at that age; she cooked for Martin and his siblings and their frequent hunger as children was due to a lack of financial support from their father; Martin's mother had a hard time raising her children due to her asthma and resulting inability to work steadily; and Martin's limited contact with his father and their relationship was not a typically "tight" one between father and child.

Both parties then indicated they had nothing further and closing statements followed. Defense counsel gave a closing

mental health, educational, employment, juvenile, and incarceration histories. In his arguments, Martin points to two instances where the trial judge took an exceptionally active role (in his view, taking the place of counsel upon realizing their deficiencies) at the mitigation hearing. As relevant to this argument, he points to the trial judge's independent procurement of his records from the Mansfield Reformatory and the "Human Services Agency." A discussion of this information occurred outside of the presence of the jury. The judge called the reformatory's warden, who informed the judge that a psychological profile resulting from interviews and testing revealed "nothing extraordinary that would trigger their interests in having further psychiatric examinations of treatment done of [*sic*] the man." The judge later provided defense counsel with a letter from the warden that was consistent with their previous conversation about the records. Defense counsel concluded that the letter was of no value for mitigation, but made it part of the record for "appellate purposes."

Mrs. Martin's affidavit states that counsel did not prepare her to testify, and that she did not know that she would testify until the day of the hearing. A review of her testimony shows that it described the following: Martin's problems with juvenile court and school; his institutionalization as a juvenile; her being on welfare during his youth; the lack of financial support from Martin's father; Martin's abnormal behavior at school, which led to his referral to the Child Guidance Center; his psychiatric testing at school; his abuse at the hands of her alcoholic husband; his physical and psychological injuries that resulted from a gas explosion; his dropping out of school to work for money to purchase adequate clothing; and other employment history. This testimony and the probation report apparently provided the factual basis for the one mitigating factor that the trial judge found - Martin's background, although the court concluded that it was outweighed by the aggravating circumstance of the crime.

direct appeal, and, therefore, he cannot show cause and prejudice for his procedural default in this regard.

### 2. Failure to investigate and prepare for trial.

Martin argues that his trial "counsel failed to adequately prepare the case and failed to conduct minimal investigation." Specifically, he takes issue with counsel's alleged failure to: (1) retain the services of experts such as a ballistics expert or a psychologist for purposes of mitigation; (2) adequately prepare for cross-examination of the State's witnesses, to wit, (a) to examine the statement that Antoinette Henderson gave to police, which provided probable cause for his arrest; and (b) to contact and/or interview Martin's mother, brother, any of the State's witnesses, and Rieves-Bey. Martin did not raise this issue in his direct appeal; thus, these issues are procedurally defaulted. However, we will review the merits of these issues for purposes of cause and prejudice analysis.

As evidence of his counsel's failings, Martin points to a fee application,[1] which shows that one of two counsel spent 31 hours preparing for trial. What he does not show, however, is how the retention of experts, an examination of Henderson's statement, and contacting and/or interviewing his family members would have been beneficial to his defense. Thus he has shown no prejudice with regard to these alleged failings.

He argues that Rieves-Bey's belief that Martin was not the man he saw fleeing from the scene of the crime shows that the failure to secure this testimony prejudiced his case. As stated above, Rieves-Bey's statements, while inconsistent with regard to the description of the fleeing man, corroborated the factual account of events testified to by Pedro. Also, Rieves-Bey's reliability as a witness is questionable at best, given the inconsistencies in his statements and testimony, and his

---

[1]We granted a motion permitting Martin to file these documents, although they were not before the district court. There is no assertion of how many hours were spent by co-counsel or the investigator.

admission of drug use and its effect on his memory. Both the State and the defense sought to secure Rieves-Bey's testimony, but he could not be located in time to appear at trial. His testimony would have been detrimental to Martin's defense and its absence will not support a finding that his trial counsel performed ineffectively, that his appellate counsel was ineffective for not raising the issue on appeal, or that he suffered prejudice by these alleged failings.

### 3.  Ineffective cross-examination

Martin argues that his trial counsel rendered ineffective assistance by failing to:  (1) effectively cross-examine Pedro regarding:  (a) the inconsistency between Pedro's and Kidd's testimony and Pedro's previous statement concerning whether Martin dropped the two off, or went inside with them, at an after-hours establishment; (b) Pedro's "falling out" with Henderson and the question of whether Henderson held a grudge against Pedro and Martin; (c) Pedro's rendition of how she found money at Robinson's store; (d) Pedro's testimony that she had argued with Martin on the day of their arrests; and (2) effectively cross-examine Henderson, regarding: (a) her grudge against Martin; and (b) inconsistency between her testimony and Pedro's testimony about overhearing discussions of the plan to rob Robinson.

Martin's arguments with regard to effective cross-examination of Pedro and Henderson are without merit. Martin points only to attenuated collateral facts and nonexistent inconsistencies in making this argument. Where arguably material inconsistencies exist, such as Henderson's and Pedro's recollections of when the robbery was discussed, other evidence (Foster's testimony about the theft of the gun, ballistics evidence, Kidd's testimony about Martin's possessing empty shell casings) corroborates or independently proves the facts that Martin contends effective cross-examination would have questioned.   In sum, the overwhelming nature of the evidence of guilt precludes Martin from showing prejudice resulting from any alleged deficiency in his counsel's cross-examination.

### B.  Mitigation

Martin makes three ineffective assistance of counsel arguments related to the mitigation phase of his capital conviction: (1) failure to investigate or prepare for mitigation; (2) failure to object to a jury instruction on the role of the jury with regard to the imposition of the death sentence; and (3) counsel's request for and the preparation and introduction of a presentence investigation report and a psychiatric clinic report.

#### 1.   Failure to investigate and otherwise prepare for the mitigation phase.

Martin argues that his counsel's most egregious failings occurred during the mitigation stage of the trial. He contends that an examination of what occurred (or did not occur) prior to and at the mitigation hearing proves that his counsel failed to investigate or otherwise prepare for sentencing. Counsel made no opening argument at mitigation. They called three witnesses: probation officer Joanna Hairston, who testified to place her presentence report into evidence; Martin's mother; and his grandmother.  Martin's reply brief also points to statements that his counsel made to the judge as evidence of prejudice and/or total abandonment.

Martin claims that his counsel failed to prepare for the mitigation hearing by failing to conduct an investigation into his background. He points to the failure of counsel to contact his immediate family members, save counsel's "talking" with his father and requesting a written statement from his mother. He does note the possibility of "limited contact [between counsel and] other family members at the courthouse on the day of the hearing."  He lists eight family members that have stated, through affidavits, that they were ready and willing to testify at mitigation but were not interviewed by counsel. Martin does not show what they would have testified to, or how such testimony could have aided him at sentencing.

Martin also takes issue with his counsel's failure to collect records and documentary evidence pertinent to his medical,