**Jamie MEADE, Petitioner,**

v.

**Fabian LAVIGNE, Respondent.**

**No. 02–CV–70016–DT.**

United States District Court,
E.D. Michigan,
Southern Division.

May 30, 2003.

852

Jamie Meade, Kincheloe, MI, Pro se.

Brenda E. Turner, Michigan Department of Attorney General, Habeas Corpus Division, Lansing, MI, for Respondent.

### OPINION AND ORDER DENYING HABEAS CORPUS PETITION

TARNOW, District Judge.

Petitioner Jamie Meade has filed an application for the writ of habeas corpus under 28 U.S.C. § 2254. The habeas petition attacks Petitioner's state court convictions for first-degree murder, accessory after the fact, and possession of a firearm during the commission of a felony (felony firearm). For all the reasons given below, the habeas petition is denied.

### I. Factual Background

In 1993, Petitioner was tried jointly with co-defendant Brian Barkley, but before separate juries, in the former Recorder's Court for the City of Detroit, Michigan. The jury found Petitioner guilty of first-degree murder, MICH. COMP. LAWS § 750.316, accessory after the fact to an assault with intent to commit murder, MICH. COMP. LAWS § 750.83, and possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b.[1]

The convictions arose from the shooting of Jason Thompson and Evelyn Blythe during a purported marijuana transaction. The evidence produced at trial established that, on January 8, 1993, Petitioner was heard saying that Jason Thompson and Evelyn Blythe needed to be robbed because Jason cheated Petitioner during a previous marijuana transaction.

On the following day, Petitioner, Brian Barkley, Christopher Long, Christopher Chirillo, and Carlton Johnson went to Ja-

---

1. Co-defendant Brian Barkley was convicted of accessory after the fact to murder, assault with intent to do great bodily harm less than murder, and felony firearm.

son Thompson's house. They left when it became apparent that they did not have enough money for the amount of marijuana that they wanted to acquire. They went to a party store where Petitioner held up a shotgun, pumped it, and said he was preparing to take care of some business. Then the group returned to Jason's house.

Christopher Long, Christopher Chirillo, and Carlton Johnson stayed in the car. Petitioner and Brian Barkley entered Jason's house where he had a bedroom in the basement. Evelyn Blythe saw the men talking. She heard a loud noise and noticed that Jason was dead. Then she heard Petitioner said, "Shoot her," and Barkley shot her. Petitioner ran up the stairs and outside to the getaway car where he told his companions to wait for Barkley. Barkley followed with the gun, which belonged to Petitioner. After both men had returned to the car, Petitioner or Barkley said that they had "popped" (shot) them. Petitioner said that he did not think the girl was dead.

Petitioner possessed marijuana in the car, but he also returned money to Christopher Long. He told Christopher Chirillo to drive to the river, and he threatened to kill everyone in the car if his instructions were not followed. Petitioner and Brian Barkley threw coats and the gun in the river. Then they went to Petitioner's apartment.

The police later retrieved the shotgun from the river. Jason Thompson died from a single gunshot wound to his face. Evelyn Blythe was shot in the shoulder and survived. Petitioner was arrested in Kentucky where he gave a statement to Detective James Curless. He initially denied knowing anything about the murder, but he later admitted to being present when Jason was shot.

Evelyn Blythe, Christopher Long, Christopher Chirillo, Carlton Johnson and others testified against the two defendants. Daniel Beaty's incriminating testimony from the preliminary examination was read into the record, because he committed suicide after the preliminary examination, but before the trial.

Petitioner testified that he and his friends went to Jason's house, left the premises because they did not have enough money for marijuana, and later returned to the house after going to a party store. He said that he heard an unexpected shot from behind him and saw Jason fall. Although he claimed to notice a gun in Brian Barkley's hand, he denied planning a robbery, seeing Barkley shoot, hearing a second shot, or telling Barkley to shoot Evelyn Blythe. According to Petitioner, Barkley admitted that he shot the victims.

## II. *Procedural History*

The trial court sentenced Petitioner to two years in prison for the felony firearm conviction, followed by concurrent terms of three to five years in prison for being an accessory after the fact to the assault on Evelyn Blythe and life imprisonment for the murder of Jason Thompson. Petitioner raised his first six habeas claims in his appeal of right. The Michigan Court of Appeals remanded the case to the trial court so that Petitioner could file a motion for new trial on his claim of ineffective assistance of counsel. The trial court held an evidentiary hearing and denied Petitioner's motion for new trial. The Michigan Court of Appeals subsequently affirmed Petitioner's convictions in an unpublished, *per curiam* opinion. *See People v. Meade*, No. 168565, 1997 WL 33349390 (Mich.Ct.App. Apr.18, 1997).

Petitioner presented the same claims to the Michigan Supreme Court. On March 31, 1998, the supreme court denied leave to appeal because it was "not persuaded that

the questions presented should be reviewed...." *People v. Meade,* 456 Mich. 952, 577 N.W.2d 688 (1998). The supreme court denied reconsideration on July 28, 1998.

Petitioner alleges that he raised his remaining habeas claims in a motion for relief from judgment filed on July 13, 1999. The trial court denied the motion on the grounds that Petitioner's "newly discovered evidence" was inadmissible hearsay and that he had failed to show "good cause" for not raising his remaining claims in prior appeals. *See People v. Meade,* No. 93001540-02 (Wayne County Cir. Ct. July 19, 1999).

Petitioner appealed the trial court's decision in a *pro se* application for leave to appeal. The Michigan Court of Appeals denied leave to appeal, stating that Petitioner had "failed to meet the burden of establishing entitlement to relief under [Michigan Court Rule] 6.508(D)." *People v. Meade,* No. 228463 (Mich.Ct.App. Apr. 13, 2001). On December 21, 2001, the Michigan Supreme Court denied Petitioner's subsequent application for leave to appeal for the same reason. *People v. Meade,* 465 Mich. 935, 638 N.W.2d 755 (2001).

Petitioner signed and dated his habeas corpus petition on December 26, 2001. He recently filed a supporting brief, which asserts the following grounds for relief:

I. The Michigan Court of Appeals clearly erred in concluding that there was sufficient evidence of Petitioner's intent and participation as an aider & abettor in a first degree felony murder contrary to clearly established federal law and basing it on an unreasonable determination of facts presented at trial.

II. Petitioner was denied a fair trial under ... both the federal and state constitutions when the prosecutor: (A) told the jury in his opening statement that a witness would testify that Petitioner confessed to shooting the deceased, but did not produce the witness for testimony; (B) south to impeach a defense witness by alleged misconduct not resulting in a conviction; (C) introduced evidence that a murder warrant for the petitioner had been approved by the prosecutor's office and a judge; (D) impressively (sic) questioned the defendant about the credibility of prosecutions witnesses; and (E) personally vouched for his case and made denigrating remarks about the defendant in the closing argument.

III. The standard order of deliberation instruction based on *People v. Handley,* 415 Mich. 356, 329 N.W.2d 710 (1982), violates Petitioner's federal and state constitutional right to be presumed innocent and coerced the jury's verdict as charged.

IV. Petitioner Meade was deprived of his right to the effective assistance of counsel, guaranteed by the United States and Michigan Constitutions by the deficient performance of trial counsel that denied him of a fair trial.

V. Petitioner was denied his right to a fair trial and confrontation when the prosecution/police failed to comply with the discovery order by (A) the late disclosure of a taped statement taken from the Petitioner and introduced at trial, and (B) suppressing a tape recorded statement of the prosecution's sole eyewitness.

VI. The trial court's off-record ruling precluding evidence explaining that the witness Daniel Beaty was unavailable because he committed

suicide denied Petitioner of his right to due process and a fair trial.

VII. The state's asserted procedural default defense does not preclude habeas review of Petitioner's claims raised on collateral review, because Petitioner was denied a full and fair hearing on the adjudication of his claims of constitutional error by the state appellate courts.

VIII. The state's appellate court's adjudication of Petitioner's motion for relief from judgement resulted in a decision that was "contrary to" and involved an "unreasonable application" of, clearly established federal law when it refused to review his constitutional claim of ineffective assistance of appellate counsel, raised on appeal for the first time, nevertheless, review it as "cause" for failing to raise claims of constitutional error in prior appeals.

IX. Petitioner was denied his right to a fair trial and due process under state and federal constitutions, when the trial court misinstructed the jury as to the law; during reinstruction omitted all the elements of aiding and abetting, omitted mere presence defense, and lesser included offense of accessory after the fact.

X. Petitioner was denied due process and a fair trial guaranteed by the United States Constitution when prosecution/police violated discovery by (A) suppressing impeachment evidence of Daniel Beaty recovering a shotgun shell from Chirillo's apartment, and (B) withheld three (3) audio statements of Angela Clark, Ricky Hall and Dutch Clark until days into trial.

XI. Petitioner was denied due process and a fair trial under both the federal and state constitutions by numerous prosecutorial misconducts: (A) during opening statements, told the jury after the incident defendant was telling the witnesses what to say, where to say they had been, however, failed to produce such evidence; (B) improperly bolstered Long, Chirillo, and Johnson's credibility during opening statements, indicating to the jury that they knew they had done something wrong and are here to testify may heighten their credibility; (C) during closing arguments the prosecutor misstated testimony, facts, and improperly expressed opinion without basis of record how deceased would have pled when shot in the head and Petitioner would be covered in blood and body parts; (D) made improper references to penal consequences; (E) repeated statement that since Long, Chirillo, and Johnson knew the weapon was in the car, argued since they knew the petitioner knew reinforcing an inference not supported by the record; (F) intentionally injected inflammatory statements during closing arguments pertaining to the victim's wounds; (G) improperly appealed to the sympathy of the jurors.

XII. Petitioner was denied his right to confrontation of Daniel Beaty, a critical prosecution witness, concerning recovery of a shotgun shell that prosecution/police suppressed, when Beaty committed suicide and preliminary examination transcripts had to be read to jury.

XIII. Petitioner was denied his right to confrontation and to a fair trial under federal and state constitutions when the prosecution/police failed to exercise due diligence to produce Brian Patterson, a res gestae witness.

XIV. Petitioner was denied due process and a fair trial when the prosecutor knowingly presented false facts to the jury, judge, and defense that Brian Patterson was served with a subpoena, failed to appeal, a warrant was issued, and police attempts to arrest him have been unsuccessful; when no actual subpoena was filed, no warrant had been issued, and no actual attempts had been made to arrest him with a warrant.

XV. Petitioner Meade was denied his right to due process and a fair trial when the prosecutor placed a brown bag on the prosecution's table containing marijuana allegedly taken from Long and Chirillo, made reference to the bag as the marijuana allegedly stolen from deceased, giving the jury an unreasonable inference that this was the drugs from the crime.

XVI. Petitioner was denied a fair trial when the trial court refused the jury's request for a written copy of the instructions once they demonstrated confusion requesting re-instruction twice. Further, lying to the jury that no written instructions existed. The court was making up the instructions from scribbles and notes.

XVII. Petitioner was denied due process and a fair trial under the federal and state constitutions when the prosecutor introduced and played before the jury a partial recording of Petitioner's audio/video statement that had been withheld by police and contained portions which seemed to be erased and missing, where the authenticity could not be proved.

XVIII. Petitioner was deprived of his right to the effective assistance of counsel, guaranteed by the United States and Michigan Constitutions, by the deficient performance of trial counsel that denied him of a fair trial.

XIX. The cumulative effect of all the errors justifies reversal.

Respondent argues in a responsive pleading filed through counsel that Petitioner's claims are barred from review by the statute of limitations and by Petitioner's procedural default of failing to raise all his claims on direct review.[2] Petitioner replies that his claims are not barred by either the statute of limitations or by the doctrine of procedural default and that his appellate attorney's ineffectiveness was cause for any procedural default.

### III. *The Statute of Limitations*

Respondent argues that Petitioner has failed to comply with the applicable one-year statute of limitations. *See* 28 U.S.C. § 2244(d). Respondent relies on the "gap theory," which maintains that an application for collateral relief in state court is not "pending," for purposes of 28 U.S.C. § 2244(d)(2), during the interval between one state court's judgment and the filing of an appeal with a higher state court. The Supreme Court has rejected this theory.

---

**2.** Respondent assumes that Petitioner is raising only the claims asserted in his second round of appeals.

*See Carey v. Saffold,* 536 U.S. 214, 219–22, 122 S.Ct. 2134, 153 L.Ed.2d 260 (2002). Accordingly, the Court declines to dismiss Petitioner's claims pursuant to the statute of limitations. The Court will proceed to address Petitioner's claims.[3]

## IV. *Discussion*

### A. *Sufficiency of the Evidence*

Petitioner alleges that there was insufficient evidence to support his conviction for felony murder as an aider and abettor. According to Petitioner, there was no evidence demonstrating that he supported or encouraged the murder, that he had a malicious state of mind, or that he set in motion a force likely to cause death or great bodily harm.

This claim requires the Court to ask whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. [T]his inquiry does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (internal citation and footnote omitted) (emphasis in original). The Court must view this standard through the framework of 28 U.S.C. § 2254(d). *Martin v. Mitchell,* 280 F.3d 594, 617 (6th Cir.), *cert. denied,* —— U.S. ——, 123 S.Ct. 515, 154 L.Ed.2d 401 (2002).

"A reviewing court does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor has been observed by the trial court." *Matthews v. Abramajtys,* 319 F.3d 780, 788 (6th Cir. 2003) (citing *Marshall v. Lonberger,* 459 U.S. 422, 434, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983)). "The mere existence of sufficient evidence to convict therefore defeats a petitioner's claim." *Id.*

The *Jackson* standard must be applied "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson,* 443 U.S. at 324 n.

---

**3.** Section 2254(d) of Title 28, United States Code, imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d). Additionally, this Court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor,* 529 U.S. 362, 405–06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). An "unreasonable application occurs" when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409, 120 S.Ct. 1495. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 410–11, 120 S.Ct. 1495.

16, 99 S.Ct. 2781. In Michigan, the elements of felony murder are:

(1) [t]he killing of a human being (2) with the intent to kill, to do great bodily harm, or to create a high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in M.C.L. § 750.316; MSA 28.548.

*People v. Thew,* 201 Mich.App. 78, 85, 506 N.W.2d 547, 550 (1993) (quoting *People v. Bush,* 187 Mich.App. 316, 327, 466 N.W.2d 736, 741 (1991)). Robbery is a felony enumerated in the statute. *See* MICH. COMP. LAWS § 750.316(1)(b).

■ To convict Petitioner on an aiding and abetting theory, the prosecutor was required to show that someone killed Jason Thompson during a robbery, that Petitioner assisted the person in killing Jason, and that Petitioner either intended to commit the crime or he knew when he gave assistance that the other person intended to commit the crime. *People v. Smielewski,* 235 Mich.App. 196, 207, 596 N.W.2d 636, 642 (1999). Aiding and abetting encompasses "all forms of assistance rendered to the perpetrator of the crime and comprehends all words or deeds which may support, encourage or incite the commission of a crime." *People v. Vicuna,* 141 Mich.App. 486, 495, 367 N.W.2d 887, 891 (1985), *disapproved of on other grounds by People v. Dalessandro,* 165 Mich.App. 569, 419 N.W.2d 609 (1988). "The aider and abettor's 'specific intent or his knowledge of the principal's specific intent may be inferred from circumstantial evidence.'" *Warren v. Smith,* 161 F.3d 358, 361 (6th Cir.1998) (quoting *People v. Eggleston,* 149 Mich.App. 665, 668, 386 N.W.2d 637, 639 (1986)).

The Michigan Court of Appeals summarized the evidence against Petitioner as follows:

[T]he evidence established that [petitioner Jamie] Meade accompanied [Brian] Barkley, who was in possession of a sawed-off shotgun belonging to Meade into the decedent's bedroom to purchase a half ounce of marijuana. Once inside, Barkley shot the decedent. Meade left the bedroom with a bag of marijuana, for which he never paid the decedent. Meade returned first to the getaway car, ordered the driver to wait for Barkley, then ordered him to drive to the river, where Meade and Barkley disposed of the shotgun, as well as their jackets. Earlier that day, while outside of a local market, Meade displayed the sawed-off shotgun to an acquaintance. [Petitioner] told the acquaintance that "he was fixing to go take care of some business" and, more specifically, "[the decedent] and [his girlfriend] need[ed] to be robbed and ganked."

*Meade,* Mich.Ct. of App. No. 168565, at 3, 1997 WL 33349390, at *2. The state court concluded that the evidence was sufficient to establish that Petitioner aided and abetted the crime of felony murder.

■ A rational trier of fact could have concluded from the evidence as summarized above that Petitioner assisted Brian Barkley in shooting Jason Thompson. At a minimum, the evidence suggested that Petitioner planned the robbery and provided the murder weapon. A rational juror also could have concluded that Petitioner either intended to kill, to do great bodily harm, or to create a high risk of death or great bodily harm or that he assisted Barkley, knowing that Barkley intended to commit the crime. In the words of the Michigan Court of Appeals,

the circumstances surrounding the incident establish that Meade assisted

Barkley in the robbery-turned-shooting death of the decedent and that, at the time he offered the assistance, Meade intended to cause great bodily harm. Meade's intent is further evidenced by the fact that Meade and Barkley were long-time friends, that Meade directed the course of events during and after the shooting, and that Meade fled to Kentucky following the incident.

*Id.* Petitioner is not entitled to the writ of habeas corpus on the basis of his first claim, because the state court's conclusion that there was sufficient evidence to support the verdict was a reasonable application of the *Jackson* standard.

### B. *The Prosecutor*

Petitioner alleges next that the prosecutor's conduct deprived him of his constitutional right to a fair trial. Specifically, alleges Petitioner, the prosecutor: (1) failed to produce Brian Patterson, whom the prosecutor predicted would testify that Petitioner confessed to shooting the deceased; (2) asked a defense witness whether he sold marijuana at his workplace; (3) introduced evidence that the prosecutor's office and a judge had approved an arrest warrant for Petitioner; (4) questioned Petitioner about the credibility of several prosecution witnesses; and (5) vouched for his case and made denigrating remarks about Petitioner in his closing argument. The Michigan Court of Appeals determined that the prosecutor's conduct was proper.[4]

Prosecuting attorneys must ensure that justice is done. *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). They "may prosecute with earnestness and vigor," but "[i]t is as much [their] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Id.*

To prevail on a claim of prosecutorial misconduct, a habeas petitioner must demonstrate that the prosecutor's remarks, in the context of the entire trial, were prejudicial and infected the trial with such unfairness that the petitioner's right to due process was violated. *Donnelly v. DeChristoforo*, 416 U.S. 637, 639, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). When determining whether prosecutorial misconduct violated a petitioner's right to due process, the Court must first consider whether the prosecutor's conduct and remarks were improper. *Macias v. Makowski*, 291 F.3d 447, 452 (6th Cir.2002). If the conduct and remarks were improper, the Court must consider whether the impropriety was flagrant and thus violated the defendant's right to due process. *Id.* The four factors for determining flagrancy are:

"(1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong."

*Id.* (quoting *United States v. Carter*, 236 F.3d 777, 783 (6th Cir.2001)) (quoting *United States v. Carroll*, 26 F.3d 1380, 1385 (6th Cir.1994)). "In deciding whether prosecutorial misconduct mandates that habeas relief be granted, the Court must

---

**4.** The Michigan Court of Appeals implied that Petitioner's claim was procedurally defaulted, because Petitioner did not object at trial to the alleged misconduct. Respondent has not raised the defense of procedural default in connection with claim II, and the Court is not required the raise the defense *sua sponte.*

*Trest v. Cain,* 522 U.S. 87, 89, 118 S.Ct. 478, 139 L.Ed.2d 444 (1997). The procedural default defense is waived as to claim II. *Hardaway v. Withrow,* 147 F.Supp.2d 697, 704 n. 1 (E.D.Mich.2001), *reversed in part on other grounds,* 305 F.3d 558 (6th Cir.2002).

apply the harmless error standard. The Court must examine 'the fairness of the trial, not the culpability of the prosecutor.'" *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir.1997) (citations omitted).

### 1. Failure to Produce a Prosecution Witness as Promised

The prosecutor advised the jury in his opening statement that Brian Patterson would testify about his conversation with Petitioner in jail. According to the prosecutor, Patterson would testify that Petitioner said he fired the shot that struck Jason Thompson. (Tr. II, at 129–30). Because the prosecutor never produced Patterson as a witness after informing the jury that Patterson would testify, Petitioner contends that the prosecutor argued facts not in evidence.

Although a prosecutor may not "assum[e] prejudicial facts not in evidence," *Berger*, 295 U.S. at 84, 55 S.Ct. 629, the prosecutor expected Brian Patterson to testify because Patterson was in jail when he was served with a subpoena. Patterson was released from custody before trial and then told by a police sergeant to appear in court. He agreed to be present, but he failed to appear as scheduled. When he could not be located, an arrest warrant was issued. (Tr. V, at 153–55).

The parties stipulated that the jury would not hear Patterson's testimony. The prosecutor then explained to the jurors that they would not be hearing from Brian Patterson because he had failed to appear and because efforts to arrest him had been unsuccessful. The prosecutor instructed the jurors that anything said about Patterson in the opening statements and what Patterson would have said was not evidence. (Tr. VI, at 12–13). The trial court repeated that, "It's not evidence one way or another. He's just not going to testify." *Id.*

This case is distinguishable from *Hicks v. Straub*, 239 F.Supp.2d 697 (E.D.Mich.

2003). Hicks argued that the prosecutor's failure to produce a witness who would testify that Hicks confessed to the shooting violated his Sixth Amendment right to be confronted with the witnesses against him. The trial court's cautionary jury instruction in *Hicks* cured nothing, and the evidence against Hicks was not strong.

■ In this case, the parties stipulated to instruct the jury to disregard the mistaken prosecutor's opening statement about Petitioner's alleged comments to his cell mate. In addition, there was overwhelming evidence of guilt. Under the circumstances, the prosecutor's failure to call Brian Patterson as a witness was not improper.

### 2. Asking a Defense Witness about Illegal Conduct

The prosecutor questioned a defense witness, Joseph Franklin, about whether he sold marijuana at his place of employment. (Tr. VI, at 82). Petitioner alleges that the question was an improper inquiry into misconduct that did not result in a conviction.

■ The prosecutor's question was a brief moment in a lengthy trial where the evidence against Petitioner was strong. In addition, the witness aptly handled the question by simply answering, "No." Therefore, even assuming that the question was improper, the alleged misconduct was not flagrant. The alleged error could not have had a "substantial and injurious effect or influence in determining the jury's verdict," *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)), and was harmless.

### 3. Eliciting Testimony about the Arrest Warrant

■ Petitioner alleges next that the prosecutor improperly elicited evidence

from an officer that the prosecutor's office and a judge approved a warrant for Petitioner' arrest. (Tr. V, at 199–201). This evidence was improper as it reflected that some government officials believed there was enough evidence against Petitioner to charge him with murder. The trial court, however, instructed the jury that Petitioner was presumed innocent and that the charges against him were not evidence. Therefore, the prosecutor's conduct, while improper, was harmless, because it could not have had a substantial and injurious effect on the jury's verdict.

#### 4. *Cross–Examining Petitioner about the Credibility of Prosecution Witnesses*

Petitioner cites two instances in the record where the prosecution asked him whether a gun was resting on his lap in the car and whether he returned money to his companions after the robbery. When Petitioner responded, "No," the prosecutor asked him whether prosecution witnesses had lied when they testified differently. (Tr. VI, at 180–81, 184). Petitioner contends that the prosecutor improperly cross-examined him by asking him whether certain prosecution witnesses had lied on the stand.

■ Under state law, a prosecutor may not ask the defendant to comment on the credibility of prosecution witnesses. *People v. Buckey,* 424 Mich. 1, 17, 378 N.W.2d 432 (1985). However, even if the prosecutor's questions were improper impeachment of Petitioner, any error was harmless due to the strength of the case.

#### 5. *Expressing Personal Belief and Denigrating Petitioner*

Petitioner's final allegation about the prosecutor pertains to the prosecutor's closing argument. Petitioner alleges that the prosecutor expressed his personal belief in the evidence and Petitioner's guilt and that he made a denigrating remark by saying that Petitioner appeared to be quite a master at spinning tales.

A prosecutor ordinarily "may not express a personal opinion concerning the guilt of the defendant." *Caldwell v. Russell,* 181 F.3d 731, 737 (6th Cir.1999). "It is unprofessional for counsel to express a personal belief or opinion in the truth or falsity of any testimony." *United States v. Collins,* 78 F.3d 1021, 1039–40 (1996)(citing *United States v. Young,* 470 U.S. 1, 9 n. 7, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985)). However, the United States Court of Appeals "has been reluctant to grant habeas petitions based on improper prosecutorial statements at closing argument." *Wilson v. Mitchell,* 250 F.3d 388, 399 (6th Cir. 2001). The Sixth Circuit also is not inclined to grant habeas relief on the basis of improper vouching. *See Byrd v. Collins,* 209 F.3d 486, 537 (6th Cir.2000).

> [The Court] may not grant such collateral relief unless [it] "find[s] that the prosecutor's comments constituted more than simply trial error under state law. The misconduct must be 'so fundamentally unfair as to deny [the defendant] due process.'" *Kincade v. Sparkman,* 175 F.3d 444, 445–46 (6th Cir.1999) (citations omitted). When evaluating claims of improper prosecutorial statements, [the Court] look[s] at the existence of objections, curative instructions, the likelihood that a jury will be misled as a result of the remarks, and the strength of the evidence against the defendant. *See id.*

*Wilson,* 250 F.3d at 399.

Petitioner did not object to the disputed remarks. (Tr. VII, at 68, 82, 87, 101, 105, 118). Moreover, the remarks do not ex-

press the prosecutor's personal belief in Petitioner's guilt. Nor did they suggest that information known only to the prosecutor supported the charges. Rather, the prosecutor argued that the evidence produced at trial supported the charges and his theory of the case. He said that he believed the evidence showed Petitioner was guilty and he believed the evidence had established the principal charges.

■ The prosecutor's comment that Petitioner was a master at spinning tales was a legitimate comment. "A prosecutor commenting that the defense is attempting to trick the jury is a permissible means of arguing so long as those comments are not overly excessive or do not impair the search for the truth." *United States v. August*, 984 F.2d 705, 715 (6th Cir.1992). The remark about spinning tales was a brief comment. (Tr. VII, at 115). The Court has no doubt that the jury would have returned a guilty verdict in the absence of the comment.

To summarize, the prosecutor's comments and questions either were not improper or flagrant or, even if they did amount to misconduct, the alleged errors were harmless. Consequently, the state court's conclusion (that the prosecutor's conduct was proper) did not result in a decision that was contrary to, or an unreasonable application of, Supreme Court decisions on prosecutorial misconduct. Petitioner is not entitled to the writ of habeas corpus on the basis of his second claim.

### C. *The Jury Instructions*

Petitioner alleges that the trial court's instruction on the order of deliberations violated his constitutional right to be presumed innocent. He also contends that the instructions coerced the verdict by implying that the evidence supported the charged offenses. The Michigan Court of Appeals concluded on review of this claim that the jury instructions fairly presented the issues to be tried and sufficiently protected Petitioner's rights.

■ "[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). "A trial court may not give a jury charge which shifts to the defendant the burden of proving a critical fact in dispute. . . ." *Warner v. Zent*, 997 F.2d 116, 133 (6th Cir.1993) (citing *Mullaney v. Wilbur*, 421 U.S. 684, 701, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975)). Nor may a court instruct a jury that the law presumes the existence of certain facts. *See Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).

The question on habeas review is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973). "It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *Id.* at 72, 112 S.Ct. 475. When reviewing an ambiguous instruction, a court must "inquire 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." *Estelle v. McGuire*, 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (quoting *Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990)).

The trial court charged the jury to consider all its instructions together as the law. The court went on to say that a person accused of a crime is presumed innocent and that this presumption entitles the defendant to a verdict of not guilty if the jurors were not satisfied that the prosecutor had proved every element of the

crime beyond a reasonable doubt. The court also instructed the jurors that the charges against Petitioner and the fact that he was on trial did not constitute evidence and that Petitioner was not required to prove his innocence or to do anything. (Tr. VIII, at 108–10).

After instructing the jurors on the charged offenses and the lesser-included offenses, the court said:

> In the case there are several different crimes that you may consider. When you discuss the case, you must consider the principal offenses charged in Counts I and II. That is, felony murder in the first degree, and assault with intent to commit murder first. If you all agree that the defendant you are considering is guilty of that crime, in that Count, you may stop your discussions and return your verdict on this Count.

> If you believe that the defendant is not guilty of the principal charge in that Count, or you cannot agree about that crime, you should consider the less serious crimes which I have defined to you applying to that Count.

> You decide how long to spend on the principal Count, the principal charge, the main Count before discussing the less serious charges. The lesser offenses. You can go back to the principal charge after discussing the less serious offenses if you want to.

*Id.* at 141–42.

The instructions as a whole adequately informed the jurors of the presumption of innocence, the prosecutor's burden of proof, and Petitioner's right not to do anything. The jurors were not told that they had to acquit Petitioner of the charged

offenses before they could consider the lesser-included offenses.

■ The Court concludes that the jury instructions did not violate the presumption of innocence and did not coerce a verdict. No rational juror could have interpreted the jury instructions as creating a presumption that Petitioner was guilty of the charged offenses or assigning to him the burden of proving that he was guilty of a lesser-included offense.

To the extent that Petitioner is arguing a violation of state law, his claim is not cognizable here, and it is not a basis for habeas relief. *McGuire,* 502 U.S. at 71–72, 112 S.Ct. 475; *see also Hardaway,* 147 F.Supp.2d at 709 (concluding that "the trial court's instruction to the jury that they could consider the offense of voluntary manslaughter if they decided that petitioner was not guilty of first or second degree murder was only a violation of state law and did not deprive petitioner of a fundamentally fair trial so as to afford him habeas relief"). Petitioner is not entitled to the writ of habeas corpus on the basis of his third claim.

### D. *Ineffective Assistance of Counsel*

Petitioner's fourth claim alleges that he was deprived of the effective assistance of trial counsel. Specifically, Petitioner contends that defense counsel should have moved to suppress his statement to the police and should have objected to the prosecutor's misconduct.

This is not a case that warrants a presumption-of-prejudice analysis. Therefore, *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), controls.[5] The Supreme Court held in

---

**5.** The United States Court of Appeals for the Sixth Circuit recently explained that, pursuant to *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), and *Bell v. Cone,* 535 U.S. 685, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002), three types of cases

warrant *Cronic's* presumption-of-prejudice analysis rather than *Strickland's* two-prong test of a deficient performance and resulting prejudice. *Mitchell v. Mason,* 325 F.3d 732, 742 (6th Cir.2003). The first type of circum-

*Strickland* that, to prevail on a claim of ineffective assistance of counsel, a party must show that defense counsel's performance was deficient and that the deficient performance prejudiced the defense. *Id.* at 687, 104 S.Ct. 2052. The first prong of this test requires showing that defense "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. 2052. The second prong requires demonstrating "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. "*Strickland* qualifies as clearly established federal law under § 2254(d)(1)." *Monzo v. Edwards,* 281 F.3d 568, 583 (6th Cir.2002).

### 1. *Failure to File a Motion to Suppress*

Petitioner contends that defense counsel should have moved to suppress his videotaped statement to a detective in Kentucky on the ground that the statement was involuntary. The videotape was played for the jury.[6] In addition, Detective James Curless of Lexington, Kentucky testified that, after he advised Petitioner of his constitutional rights, Petitioner said he did not know how Jason Thompson was killed. Petitioner subsequently admitted to Curless that he was present when Jason was shot. Petitioner told Curless that he grabbed the marijuana and started to walk away when he heard a bang. He claimed that Brian Barkley had held a gun, although he did not see the gun before he heard the gunshot. (Tr. IV, at 194–214).

### a. *Petitioner's Testimony*

Petitioner testified at a post-conviction hearing that, following his arrest, he was placed in a holding cell for five or six hours. During that time, the police continued to ask him if he wanted to make a statement. Then Detective Curless took him to an interrogation room. He was not offered food or drink. Curless told him that he was wanted for questioning in Michigan, but that he had not been charged and there was no evidence against him. Curless promised to release him if he gave a statement, but he said that Petitioner was going to prison for life if he did not make a statement. Curless also said that the statement was not being taped. Petitioner told the police that he did not want to talk. He felt pressured to give a statement because he was held so long in a room by himself. He believed Curless when Curless said that he would try to help him and that it might be easier for him if he made a statement. He finally agreed to speak with Curless because he "was tired of .. sitting in there all the time." He was "bored and fed-up with everything." Although he was not allowed to use the restroom for five to six hours, he did not remember if he asked for one and he did not believe that he needed one. (EH, IV at 20–27, 49).

Petitioner further testified that he subsequently asked his trial attorney whether the file included a statement. His attorney responded that there was no statement. During trial he learned for the first time that his statement had been recorded. *Id.* at 31–32.

stance that warrants a presumption-of-prejudice analysis is the complete denial of counsel at a critical stage of the proceedings; the second is when counsel fails to subject the prosecution's case to meaningful adversarial testing; and the third occurs when counsel is placed in circumstances in which competent counsel very likely could not render assistance. *Id.*

**6.** It has not been transcribed in the record. *See* Tr. VI, at 7.

### b. *Defense Counsel's Testimony*

Petitioner's trial attorney testified that there was no reference to the statement in the discovery materials and that he and the prosecutor viewed the videotaped statement for the first time during the trial. In his opinion, the statement was damaging to the defense, because it indicated that Petitioner initially lied to the police. The statement made it necessary for Petitioner to testify (1) to support the defense theory that he was merely present and an accessory after the fact, (2) to explain why he initially denied everything, and (3) to demonstrate that he was not racist.[7] (EH II, at 27–35, 43–45)

Defense counsel had no explanation for his failure to request a hearing on the voluntariness of Petitioner's statement. On the other hand, he did not know if he would have prevailed had he filed a motion to suppress the statement. He testified that the likelihood of success on a motion to suppress would have depended on Petitioner's testimony at the hearing. He did not think that the videotape demonstrated an involuntary statement, and he had not been comfortable asking the jury to disbelieve the statement on the ground that it was coerced. (EH III, at 8–14, 28).

### c. *The State Court Decisions*

The trial court determined that Petitioner's pretrial statement was voluntary and that a hearing to suppress the statement would have been futile for that reason. The court concluded that defense counsel was not ineffective in failing to attempt to suppress the statement.

The Michigan Court of Appeals noted on review of Petitioner's claim that Petitioner had completed tenth grade and he had

admitted that he was advised of his rights and that he understood his rights. More importantly, [Petitioner] testified that he agreed to speak with interrogating officers simply because "he was bored and fed-up with everything." Although Meade claims that he was deprived of food, drink, and use of the restroom, there is no evidence that he ever requested, or otherwise indicated, to the interrogating officers, that he was hungry, thirsty or in need of a restroom. Further, there is no evidence of physical coercion or abuse by the interrogating officers.

*Meade,* Mich.Ct.App. No. 168565, at 5, 1997 WL 33349390, at *4. The court of appeals agreed with the trial court that Petitioner's statement was voluntary and therefore admissible. The court opined that any objection would have been futile, that Petitioner was not prejudiced by his attorney's inaction, and that Petitioner was not deprived of effective assistance of counsel.

### d. *Conclusion*

■■■ This Court agrees that, even assuming defense counsel's performance was deficient, Petitioner was not prejudiced by his attorney's inaction. The trial court determined that the statement was voluntary and that it would have denied a motion to suppress had one been filed.

Furthermore, the evidence of Petitioner's guilt was strong, and the jury almost certainly would have convicted Petitioner in the absence of the videotaped statement. The jurors apparently were not persuaded by Petitioner's statement, but by Daniel Beaty's testimony at the preliminary examination.

---

**7.** Apparently, Petitioner made remarks in his videotaped statement that could have been interpreted as being racist. (EH, at 45, 98).

The Court concludes that the state appellate court's conclusion concerning Petitioner's claim of ineffective assistance of counsel was objectively reasonable. Accordingly, Petitioner has no right to habeas relief on the basis of his attorney's failure to move to suppress Petitioner's statement.

### 2. *Failure to Object to the Prosecutor's Conduct*

Petitioner also alleges that defense counsel should have objected to the prosecutor's conduct. *See* Claim II regarding the failure to produce Brian Patterson, the question put to a defense witness about whether he sold marijuana, the evidence that state officials had approved a warrant for Petitioner's arrest, the cross-examination of Petitioner regarding the credibility of prosecution witnesses, and the alleged expression of a personal belief and a denigrating remark. The Michigan Court of Appeals adjudicated this claim on the merits and concluded that the claim lacked merit.

■■■ This Court found no merit in Petitioner's claim about the prosecutor's conduct. *See infra* Section IV.B. The Court determined that either the prosecutor's conduct was not improper or flagrant or it was harmless error. Therefore, defense counsel's failure to object to the prosecutor's conduct did not amount to deficient performance, and the alleged deficiency did not prejudice the defense. It follows that the state court's conclusion was not contrary to, or an unreasonable application of, *Strickland.*

### E. *Failure to Comply with a Discovery Order*

Petitioner's fifth claim is that he was denied his right to a fair trial and his right of confrontation when the prosecution or the police failed to comply with the trial court's discovery order.

### 1. *Tardy Disclosure of Petitioner's Statement*

■■■ Petitioner contends that the prosecution provided tardy disclosure of his taped statement to Detective Curless. The Supreme Court held in *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady,* however, applies only to a complete failure to disclose, not tardy disclosure, unless the defendant has been prejudiced by the delay. *Norris v. Schotten,* 146 F.3d 314, 334 (6th Cir.1998).

[17] Petitioner has not demonstrated how he was prejudiced by the delay in acquiring his videotaped statement. He was able to prepare a defense that was consistent with what he told Detective Curless, and he could have moved to suppress his statement during trial when he learned about the videotape.

Furthermore, a true *Brady* violation has three components: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). "[F]avorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles v. Whitley,* 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (quoting *United States v. Bagley,* 473 U.S. 667, 682, 685, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)).

Petitioner's statement to Detective Curless was not favorable to the defense. In fact, defense counsel testified at the post-conviction evidentiary hearing that, although Petitioner's videotaped statement did not contain a confession, it was damaging to the defense. The Court therefore concludes that Petitioner had not made out a true *Brady* claim. Furthermore, the alleged violation of a state discovery rule is not cognizable on habeas review, because it is not a constitutional violation. *Lorraine v. Coyle*, 291 F.3d 416, 441 (6th Cir.), *corrected on reh'g*, 307 F.3d 459 (6th Cir. 2002), *and cert. denied*, —— U.S. ——, 123 S.Ct. 1621, 155 L.Ed.2d 489 (2003). The state court's denial of relief did not result in a decision that contrary to, or an unreasonable application of, Supreme Court precedent.

#### 2. *Suppression of a Prosecution Witness's Statement* [8]

Petitioner also alleges that the prosecution suppressed the tape-recorded statement of Evelyn Blythe, who was the surviving victim and an important eyewitness. Blythe gave a statement to the police while she was confined in the hospital after the shooting. Petitioner alleges that he could have used that statement to impeach Blythe's trial testimony. Petitioner contends that he wanted to use Blythe's statement to point out her failure to tell the police that Petitioner ordered Brian Barkley to shoot her.

Blythe admitted on cross-examination by defense counsel that the first time she mentioned to anyone that Petitioner ordered Barkley to shoot her was on direct examination. (Tr. III, at 58–59). Police Officer William Cooper confirmed that Blythe did not tell him about Petitioner ordering Brian Barkley to shoot her. (Tr. V. at 216, 220).

██ Thus, the discrepancy between Blythe's testimony and her statement to the police was revealed to the jury despite the alleged suppression of Blythe's statement. The nondisclosure of Blythe's statement did not prejudice Petitioner. Consequently, the state court's denial of relief did not result in a decision that contrary to federal law, an unreasonable application of clearly established federal law, or an unreasonable application of the facts.

#### F. *Evidence of Beaty's Suicide*

Petitioner's sixth claim alleges that the trial court's refusal to let him explain why Daniel Beaty did not testify deprived him of his rights to due process and a fair trial. Daniel Beaty was the witness who committed suicide after testifying at the preliminary examination, but before trial. Petitioner alleges that he wanted to explain to the jurors why Beaty was unavailable, and that the trial court's ruling deprived him of his right of confrontation. The Michigan Court of Appeals determined that Beaty's testimony from the preliminary examina-

---

**8.** Because this claim was raised in the Michigan Supreme Court, but not in the Michigan Court of Appeals, there is no state court adjudication of the claim on the merits. When "the state court has not articulated its reasoning, federal courts are obligated to conduct an independent review of the record and applicable law to determine whether the state court decision is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of

the facts in light of the evidence presented. That independent review, however, is not a full, *de novo* review of the claims, but remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA." *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000) (internal citations omitted), *cert. denied*, 532 U.S. 947, 121 S.Ct. 1415, 149 L.Ed.2d 356 (2001).

tion was properly admitted and that the trial court did not abuse its discretion.

"Habeas review does not encompass state court rulings on the admission of evidence unless there is a constitutional violation." *Clemmons v. Sowders*, 34 F.3d 352, 357 (6th Cir.1994). The constitutional violation alleged here is the denial of the right of confrontation. *See* U.S. CONST. amend. VI; *see also Pennsylvania v. Ritchie*, 480 U.S. 39, 51, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987) (noting that the Confrontation Clause provides two types of protections for a criminal defendant: the right to face those who testify against the defendant and the right to cross-examine witnesses).

Petitioner and his co-defendant cross-examined Daniel Beaty through counsel at the preliminary examination. The Michigan Court of Appeals described the cross-examination as "detailed questioning as to Beaty's powers of observation, recall, and credibility. In fact, [Petitioner's] attorney attempted to impeach Beaty's credibility with a prior statement to police." *Meade*, Mich.Ct.App. No. 168565, at 6, 1997 WL 33349390, at *5.

■ There is no evidence in the record that whatever circumstances or condition led to Beaty's suicide affected his powers of observation before the shooting or his ability to testify at the subsequent preliminary examination. Beaty's testimony at the preliminary examination was damaging to Petitioner's defense, but the reason for his unavailability at trial was not relevant to any of the issues raised at trial. Therefore, Petitioner's constitutional rights were not violated by the trial court's decision to exclude information about Beaty's suicide. The state court's denial of relief was not contrary to, or an unreasonable application of, any Supreme Court decision.

## G. *The Remaining Claims*

Petitioner alleges that he raised his remaining claims in his motion for relief from judgment and subsequent appeals. The trial court denied Petitioner's motion, and the State's appellate courts denied leave to appeal the trial court's decision. Respondent argues that claims VII through XIX are barred from substantive review by Petitioner's failure to raise them on direct appeal.

■ A procedural default in the habeas context is "a critical failure to comply with state procedural law. . . ." *Trest v. Cain*, 522 U.S. 87, 89, 118 S.Ct. 478, 139 L.Ed.2d 444 (1997). The doctrine of procedural default provides that,

[i]n all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). In *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986), the Sixth Circuit set forth a four-part test for determining whether a prisoner's constitutional claim is procedurally defaulted and barred from habeas review. Courts must determine whether: (1) there is a relevant state procedural rule and whether the petitioner failed to comply with that rule; (2) the state courts actually enforced the state procedural rule; and (3) the procedural rule is an adequate and independent state ground on which the state can rely to foreclose federal review of a constitutional claim; and (4) the petitioner has shown cause for not complying with the procedural rule and that failure to

review the claim will result in prejudice or a miscarriage of justice. *Id.* at 138.

### 1. *Compliance with the Procedural Rule*

The procedural rule in question is Michigan Court Rule 6.508(D), which prohibits granting relief from judgment if a motion

(1) seeks relief from a judgment of conviction and sentence that still is subject to challenge on appeal pursuant to subchapter 7.200 or subchapter 7.300;

(2) alleges grounds for relief which were decided against the defendant in a prior appeal or proceeding under this subchapter, unless the defendant establishes that a retroactive change in the law has undermined the prior decision;

(3) alleges grounds for relief, other than jurisdictional defects, which could have been raised on appeal from the conviction and sentence or in a prior motion under this subchapter, unless the defendant demonstrates

(a) good cause for failure to raise such grounds on appeal or in the prior motion, and

(b) actual prejudice from the alleged irregularities that support the claim for relief.

Mich. Ct. R. 6.508(D) (effective October 1, 1989).

Petitioner violated Rule 6.508(D)(3) by not raising all his habeas claims on direct appeal. The two last state courts to review Petitioner's remaining claims were the Michigan Court of Appeals and the Michigan Supreme Court on collateral review. Both courts enforced Rule 6.508(D)(3) by stating that Petitioner had failed to establish entitlement to relief under Rule 6.508(D).

Rule 6.508(D)(3) was firmly established and regularly followed before Petitioner's trial and subsequent appeal.[9] Moreover, the state courts' brief orders stating that Petitioner was not entitled to relief under Rule 6.508(D) was a sufficient explanation for federal district courts to conclude that the order was based on a procedural bar, even though the state courts did not refer to a subsection of the rule. *Burroughs v. Makowski,* 282 F.3d 410, 414 (6th Cir.), *modified on other grounds,* 35 Fed.Appx. 402 (6th Cir.2002); *Simpson v. Jones,* 238 F.3d 399, 407 (6th Cir.2000). Thus, in order for Petitioner to prevail on claims VII through XIX, he must show cause for his procedural default and resulting prejudice or that failure to review his claims will result in a miscarriage of justice. *Coleman,* 501 U.S. at 750, 111 S.Ct. 2546.

### 2. *"Cause"*

Petitioner alleges in claim VIII that his appellate attorney was cause for his failure to raise all his claims on direct appeal. Constitutionally ineffective assistance of counsel *is* "cause" for a state procedural default. *Murray v. Carrier,* 477 U.S. 478, 488, 106. S.Ct. 2639, 91 L.Ed.2d 397 (1986). In other words, "[i]f [Petitioner] can show that he received ineffective assistance of appellate counsel that rose to the level of a violation of his Sixth Amendment rights, it would excuse his procedural default." *Martin,* 280 F.3d at 605.

Indigent appellants have no constitutional right to compel their appointed attorneys to make every nonfrivolous argument on appeal. *Evitts v. Lucey,* 469 U.S. 387, 394, 105 S.Ct. 830, 83 L.Ed.2d

---

**9.** Rule 6.508(D) was regularly followed as of 1990. *Simpson v. Jones,* 238 F.3d 399, 407 (6th Cir.2000) (citing *Luberda v. Trippett,* 211 F.3d 1004, 1008 (6th Cir.2000), and *Jones v.*

*Toombs,* 125 F.3d 945, 947 (6th Cir.1997)). Therefore, Petitioner can be deemed to have been apprised of Rule 6.508(D) by the time he filed his appellate brief in 1994.

821 (1985); *Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). Tactical choices about which claims to raise on appeal "are properly left to the sound professional judgment of counsel. . . ." *United States v. Perry*, 908 F.2d 56, 59 (6th Cir.1990). In fact, "the hallmark of effective appellate advocacy" is the "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail." *Smith v. Murray*, 477 U.S. 527, 536, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986) (quoting *Barnes*, 463 U.S. at 751–52, 103 S.Ct. 3308). "Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir.1986) (quoted in *Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir.2002)). "[A]n appellate advocate may deliver deficient performance and prejudice a defendant by omitting a 'dead-bang winner,' even though counsel may have presented strong but unsuccessful claims on appeal." *United States v. Cook*, 45 F.3d 388, 395 (10th Cir.1995) (citing *Page v. United States*, 884 F.2d 300, 302 (7th Cir.1989)). A "dead-bang winner" is an issue which was obvious from the trial record, *see e.g.*, *Matire v. Wainwright*, 811 F.2d 1430, 1438 (11th Cir.1987) (counsel's failure to raise issue which " 'was obvious on the record, and must have leaped out upon even a casual reading of [the] transcript' was deficient performance), and one which would have resulted in a reversal on appeal." *Id.*

To prevail on a claim of ineffective assistance of appellate counsel, Petitioner must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the appeal. *Strickland*,

466 U.S. at 687, 104 S.Ct. 2052; *Carpenter v. Mohr*, 163 F.3d 938, 946 (6th Cir.1998), *reversed on other grounds sub nom Edwards v. Carpenter*, 529 U.S. 446, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000). The first prong of this test (deficient performance) "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. The second prong of the test (prejudice) requires showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052. Review of counsel's performance is highly deferential and requires courts to "indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. 2052. The Court will proceed to examine briefly claims IX through XIX to determine whether Petitioner's appellate attorney should have raised those claims on direct review.[10]

Claim IX alleges that the trial court erred when it instructed the jury on intent and aiding and abetting. Contrary to Petitioner's allegations, the trial court's instructions did not permit the jury to convict Petitioner solely on the basis of his codefendant's actions. And the fact that the trial court may have omitted aiding and abetting instructions when re-instructing the jurors was advantageous to the defense. It eliminated an additional theory on which the jury could find Petitioner guilty. The attorneys repeatedly expressed their satisfaction with the trial

**10.** Claim VII is not a substantive claim. It merely asserts that Respondent's procedural default defense does not preclude the Court from reviewing Petitioner's claims, because

Petitioner was deprived of a fair and full hearing in state court. Claim VIII alleges ineffective assistance of appellate counsel.

court's jury instructions and the court's reiteration of certain instructions. Therefore, appellate counsel was not ineffective for failing to attack the jury instructions on the grounds raised by Petitioner in claim IX.

Claim X alleges that Petitioner was denied due process when the prosecution or police suppressed evidence that Daniel Beaty recovered a shotgun shell from Christopher Chirillo's apartment. Petitioner also alleges that the prosecution withheld the exculpatory statements of Angela Clark, Ricky Hall, and Dutch Clark until trial. Claim XII alleges that Petitioner was denied his right to confront Beaty concerning his recovery of the shotgun shell.

Prosecution witnesses testified that they met in Christopher Chirillo's apartment before going to Jason Thompson's house and that Brian Barkley accidentally fired a gun in Chirillo's apartment. Therefore, evidence that Daniel Beaty recovered a shotgun shell from the apartment would not have made a difference in the outcome of the trial. The tardy disclosure of statements from Angela Clark, Ricky Hall, and Dutch Clark was not a basis for appeal because, as previously explained, *Brady* generally does not apply to late disclosures of discovery. *Norris*, 146 F.3d at 334. Petitioner's *Brady* claims have no merit, and his claim under the Confrontation Clause has no merit because the alleged error was harmless.

Claim XI alleges that the prosecutor committed misconduct during his opening statement and closing arguments. The comments about which Petitioner complains were based on the evidence. The prosecutor was permitted to make reasonable inferences from the evidence and to suggest that Petitioner's testimony was not credible. To the extent that his remarks may have been improper, they were harmless due to the overwhelming evidence against Petitioner.

Claims XIII and XIV allege that Petitioner was denied his right to confront witnesses and his right to a fair trial when the prosecution and police misrepresented the facts and failed to exercise due diligence in producing Brian Patterson. This claim has no merit, because Patterson's testimony would have inculpated Petitioner. And, as defense counsel pointed out at the evidentiary hearing, it is helpful to the defense when it becomes obvious that the prosecutor cannot prove something he set out to prove.

Claim XV alleges that Petitioner was denied due process and a fair trial when the prosecutor placed a brown bag on the prosecution's table and implied that the bag contained the marijuana stolen from Jason Thompson. Appellate counsel was not remiss in omitting this claim from his appellate brief, because Petitioner did not dispute that he went to Jason's house to acquire marijuana. Moreover, there was testimony suggesting that Petitioner left the house with the marijuana and the purchase money.

Claim XVI alleges that Petitioner was denied a fair trial when the trial court refused the jurors' request for a written copy of the jury instructions. The trial court re-read portions of the jury instructions to the jurors on request; the court was not required to give the jurors a written copy of the instructions. Therefore, appellate counsel was justified in not raising claim XVI on appeal.

XVII alleges that Petitioner was denied due process and a fair trial when the prosecution introduced a partial recording of his statement to the police. Petitioner claims that portions of the videotape appeared to have been erased and that the authenticity of the videotape could not be proved.

Defense counsel stipulated with the prosecutor to delete irrelevant portions of the videotape shown to the jury (Tr. VI, at 4–11), and there is no evidence in the record suggesting that someone tampered with the videotape or that the videotape was not authentic. Therefore, Claim XVII is meritless.

XVIII alleges ineffective assistance of trial counsel. Petitioner contends that trial counsel failed to seek pretrial discovery, erroneously stipulated to the unavailability of Brian Patterson, failed to challenge the authenticity of Petitioner's recorded statement, failed to request a jury instruction on accomplish testimony, and failed to object to prosecutorial misconduct. The Court is not persuaded that, but for defense counsel's alleged errors and omissions, the result of the trial would have been different. Therefore, Petitioner was not prejudiced by his trial attorney's allegedly deficient performance.

Petitioner's final claim alleges that the cumulative effect of all the errors justifies reversal. Because the Michigan Court of Appeals found no errors in the trial court proceedings, it is unlikely that the court of appeals would have been persuaded by the cumulative effect of all the alleged errors.

In summary, claims IX through XIX are not "dead bang winners." Therefore, Petitioner has not shown "cause," via ineffective assistance of appellate counsel, for his procedural default of failing to raise all his claims on direct review. The Court's "inquiry is at an end; by definition, appellate counsel cannot be ineffective for a failure to raise[ ] issue[s] that lack[ ] merit." *Greer v. Mitchell,* 264 F.3d 663, 676 (6th Cir.2001), *cert. denied,* 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002).

### 3. *"Prejudice"; Miscarriage of Justice*

■ The Court need not determine if Petitioner was prejudiced by the alleged violations of federal law, because he has not demonstrated "cause." *See Smith,* 477 U.S. at 533, 106 S.Ct. 2661. The remaining question is whether the Court's failure to consider Petitioner's procedurally default claims on the merits will result in a miscarriage of justice. The exception for miscarriages of justice requires showing that a constitutional violation probably resulted in the conviction of one who is actually innocent. *Schlup v. Delo,* 513 U.S. 298, 326–27, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995); *Carrier,* 477 U.S. at 496, 106 S.Ct. 2639.

Petitioner has not shown that, in light of some new and reliable evidence, "no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Id.* at 329, 120 S.Ct. 1495. Consequently, the exception for fundamental miscarriages of justice does not apply here.

### V. *Conclusion*

Claims IX through XIX are barred from substantive review by Petitioner's state procedural default of failing to raise those claims on direct review. Petitioner's other claims have no merit, because the state court's decision on those claims was objectively reasonable. Accordingly, the application for a writ of habeas corpus is **DENIED.**